# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT E. CHRISTOFFERSON, et al., | Case No. 1:18-cv-01370-AWI-SAB |
| Plaintiffs, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT |
| v. | |
| ALL PURE POOL SERVICE OF CENTRAL CALIFORNIA, INC., et al., | (ECF Nos. 81, 82, 83, 84, 85, 90, 92, 93, 94) |
| Defendants. | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

Currently before the Court is Plaintiffs' motion for default judgment filed on May 4, 2020.  (ECF No. 81.)  On June 10, 2020, the Court held a hearing on the motion for default judgment via videoconference, at which Counsel Keith White appeared on behalf of Plaintiffs, and no appearances were made on behalf of Defendants.  (ECF No. 94.)  Having considered the moving papers, the declarations and exhibits attached thereto, arguments presented at the June 10, 2020 hearing, as well as the Court's file, the Court issues the following findings and recommendations.

## I.

## BACKGROUND

### A.    Procedural History

Plaintiffs Robert Christofferson and Sandra Christofferson ("Plaintiffs") filed this action on October 4, 2018, bringing claims for breach of contract, money on common counts, claim and delivery, and breach of guaranty against Defendants All Pure Pool Service of Central California,

1   Inc. ("All Pure"), All Pure Pool & Spa, Inc. ("APPS"), Jack Carter as Trustee of the of the Carter

2   Family Trust ("Jack Carter"), Susie Carter as Trustee of the Carter Family Trust ("Susie Carter")

3   (Jack Carter and Susie Carter are collectively referred to herein as the "Carters") ("Trustee" shall

4   refer to their capacity as Trustees of the Carter Family Trust),[1] Phil Zavala, and Julie Zavala

5   (Phil Zavala and Julie Zavala are collectively referred to herein as the "Zavalas") (all named

6   Defendants are collectively referred to herein as the "Defendants").  (ECF No. 1.)  Defendants

7   All Pure and APPS were served with the originally filed complaint on November 15, 2018, and

8   the summonses were returned executed and filed on November 26, 2018.  (ECF No. 5.)

9   Defendant Jack Carter was served as Trustee on November 16, 2018, and Defendant Susie Carter

10  was served as Trustee on November 20, 2018, with the summonses for the Carters returned

11  executed and filed on November 28, 2018.  (ECF Nos. 6, 7.)  Defendants Phil Zavala and Julie

12  Zavala were served on November 28, 2019, with the summonses returned executed and filed on

13  December 31, 2018.  (ECF Nos. 10, 11.)

14      No Defendants filed a responsive pleading, a motion to dismiss, or otherwise appeared in

15  this action.  On January 23, 2019, the Court issued an order requiring Plaintiffs to either advise

16  the Court of the status of the action or file a request for entry of default.  (ECF No. 12.)  On

17  January 24, 2019, Plaintiffs filed a notice of settlement, and on January 28, 2019, the Court

18  issued an order requiring dispositive documents to be filed within sixty days.  (ECF Nos. 13, 14.)

19  On March 21, 2019, Plaintiffs requested additional time to file dispositive documents, and stated

20  in the request that they had informed Defendants that Defendants had to either accept the terms

21  of the pending settlement agreement or file a responsive pleading no later than March 25, 2019.

22  (ECF No. 15.)  On March 22, 2019, the Court issued an order: (1) requiring Defendants to file a

23  responsive pleading on or before March 25, 2019 if a settlement agreement was not reached; (2)

24  granting Plaintiffs' request for an extension to file dispositive documents; (3) requiring Plaintiffs

25  to file either dispositive documents if a settlement was reached or a request for entry of default,

26

27  _____
[1]  The Carters were not named in their individual capacities in either the originally filed complaint nor the first
amended complaint.  (ECF Nos. 1, 30.)  Following the Court's highlighting of this issue at the hearing on the
28  previous motion for default judgment, the Carters are now named in both their individual and Trustee capacities in
the second amended complaint.  (ECF No. 59.)

on or before April 29, 2019; and (4) requiring Plaintiffs to serve a copy of the order on Defendants within two days of entry of the order.  (ECF No. 16.)

On April 3, 2019, Plaintiffs filed a request for entry of default and served the request on Defendants through electronic service as well as by postal mail.  (ECF No. 18.)  On April 3, 2019, the Clerk of the Court entered the default of all Defendants.  (ECF No. 22.)[2]  On April 4, 2019, pursuant to the Plaintiffs' Rule 41 notice, the Court dismissed all Doe Defendants in the action.  (ECF No. 23.)

On April 4, 2019, the District Judge assigned to this action issued an order to show cause as to why the case should not be dismissed due to insufficient pleading of citizenship of the parties and failure to establish diversity jurisdiction.  (ECF No. 24.)  On April 17, 2019, Plaintiffs submitted a response to the order to show cause and supporting declarations.  (ECF Nos. 25, 26, 27.)  On May 2, 2019, the District Judge issued an order discharging the April 4, 2019 order to show cause and ordered Plaintiffs to file a first amended complaint within fourteen days of service of the order.  (ECF No. 29.)  The May 2, 2019 order also specified that because the Defendants had defaulted for failing to appear in the action, and because the to be filed first amended complaint was to cure jurisdictional defects identified in the order to show cause and would not establish a new claim for relief, no further service of the amended complaint on the Defendants was necessary to proceed with the action.  (Id.)  On May 7, 2019, Plaintiffs filed a first amended complaint.  (First Am. Compl. ("FAC"), ECF No. 30.)

On June 25, 2019, the Court issued an order requiring Plaintiff to file a motion for default judgment within sixty days of service of the order.  (ECF No. 32.)  On August 2, 2019, Plaintiffs filed an application for default judgment and supporting materials.  (ECF Nos. 33, 34, 35, 36.)

On August 23, 2019, the Court ordered supplemental briefing to address the following matters prior to the hearing on the motion for default judgment: (1) whether the Carters were required to be named and served in their individual capacities rather than solely as trustees; (2) whether the UCC filing acknowledgement forms had lapsed leaving security interests

---

[2]  As discussed below, the April 3, 2019 entry of default was vacated on October 7, 2019, pursuant to the Court's order granting Plaintiff's request to vacate the entry of default.  (ECF No. 57.)

1  unperfected; (3) whether offsets from the sale of collateral were properly delineated in Plaintiffs'
2  proposed order; (4) the application of the Eitel factors to the application for default judgment;
3  and (5) the need for time records to assess the requested attorneys' fees.  (ECF Nos. 40, 41.)  On
4  August 23, 2019, Plaintiffs requested a continuance of the hearing on the instant application to
5  allow for additional time to submit supplemental briefing.  (ECF No. 42.)  On August 26, 2019,
6  pursuant to Plaintiffs' request, the Court continued the hearing until September 11, 2019, and
7  extended the due date for supplemental briefing until September 4, 2019.  (ECF No. 43.)

8        On September 4, 2019, Plaintiffs filed supplemental materials addressing the issues
9  highlighted by the Court.  (ECF Nos. 46, 47, 48, 49, 50.)  On September 11, 2019, the Court held
10  a hearing on Plaintiffs' motion for default judgment.  (ECF No. 52.)  Counsel Keith White
11  appeared on behalf of Plaintiffs and no Defendants made an appearance.  (Id.)  In response to the
12  Court's questions at the hearing, Plaintiffs requested a continuance of the hearing.  The Court
13  continued the hearing to October 16, 2019, and ordered Plaintiffs shall file a status report along
14  with any necessary supplemental briefing on or before October 2, 2019.  (ECF No. 51.)

15        On October 2, 2019, Plaintiffs filed a status report and an *ex parte* request: (1) to
16  withdraw the application for entry or default judgment and vacate entry of default; and (2) for
17  leave to file a second amended complaint.  (ECF No. 54.)  On October 7, 2019, the Court granted
18  Plaintiffs' request and: (1) withdrew Plaintiff's application for default judgment filed on August
19  2, 2019; (2) vacated the entries of default entered on April 3, 2019; and (3) granted leave for
20  Plaintiffs to file a second amended complaint.  (ECF No. 57.)

21        On October 11, 2019, Plaintiffs filed a second amended complaint, the operative
22  complaint in this matter.  (Second Am. Compl. ("SAC"), ECF No. 59.)  On December 17, 2019,
23  Plaintiff apparently filed erroneous proofs of service showing All Pure and APPS were served on
24  November 15, 2018.  (ECF Nos. 62, 63.)  Also on December 17, 2019, Plaintiffs filed proofs of
25  service showing service of the second amended complaint on: (1) Jack Carter in an individual
26  capacity on November 30, 2019; (2) Jack Carter as Trustee on November 30, 2019; (3) Susie
27  Carter in an individual capacity on November 30, 2019; (4) Susie Carter as Trustee on November
28  30, 2019; and (5) Phil Zavala on November 12, 2019.  (ECF Nos. 64, 65, 66, 67, 68.)  On

February 4, 2020, Plaintiffs filed a proof of service demonstrating service of the second amended complaint on Julie Zavala on January 2, 2020.  (ECF No. 69.)  On February 28, 2020, Plaintiffs filed proofs of service demonstrating service on APPS and All Pure on November 8, 2019.  (ECF Nos. 70, 71.)

On March 4, 2020, Plaintiffs filed a request for entry of default and a declaration of counsel Darryl J. Horowitt in support of the request.  (ECF Nos. 72, 73.)[3]  On March 4, 2020, the Clerk of the Court entered default against Defendants: (1) APPS; (2) All Pure; (3) Jack Carter; (4) Susie Carter; (5) Julie Zavala; and (6) Phil Zavala.  (ECF Nos. 74, 75 76, 77, 78, 79.)  The entry of defaults for Jack Carter and Susie Carter do not delineate as to whether the entry of default pertains to their individual capacity or capacity as Trustee.  (ECF Nos. 76, 77.)

On March 5, 2020, the Court ordered Plaintiffs to file a motion for default judgment within sixty (60) days of entry of the order.  (ECF No. 80.)  On May 4, 2020, Plaintiffs filed a motion for default judgment against all Defendants on the second amended complaint along with supporting materials.  (ECF Nos. 81, 82, 83, 84, 85, 86, 87, 88, 89, 90.)[4]

On May 5, 2020, the Court set a hearing on the motion for default judgment to be held on June 10, 2020, and ordered Plaintiffs to serve a notice of the hearing on Defendants.  (ECF No. 91.)  On May 5, 2020, Plaintiffs filed a notice demonstrating the order had been served on Defendants via postal mail and electronic service to certain email addresses.  (ECF No. 92.)  On June 9, 2020, Plaintiffs filed a supplemental declaration notifying the Court that since the time of the filing of the motion for default judgment, negotiations continued and Defendants had made two additional payments of $3,000.00, for a total of $6,000.00.  (ECF No. 93.)

On June 10, 2020, the Court held a hearing on the motion for default judgment via

---

[3] Both the request for entry of default and supporting declaration refer to all Defendants generally, however, they only refer to Defendants Jack Carter and Susie Carter as Trustees and do not expressly refer to them in their individual capacity in the first portion of the document containing the initial text of the request.  (Id.)  The second portion of each of the documents do refer to Jack Carter and Susie Carter as being served in both their individual and Trustee capacities, and refer to all defendants generally as "Defendants."  (Id.)  The Court addresses this issue further below, infra Section III(B).

[4]  Three of these filings were proposed orders that were apparently filed containing errors, before a final fourth and final proposed order was filed.  (ECF Nos. 86, 88, 89, 90.)

videoconference.  (ECF No. 94.)  Counsel Keith White appeared on behalf of Plaintiffs, however no Defendants made an appearance at the hearing.[5]  (Id.)  On June 11, 2020, in response to the Court's questions presented at the hearing concerning the accounting calculations, Plaintiffs' counsel filed a supplemental declaration addressing such questions, and further applying the two recent payments of $3,000.00 to the accounting calculations.  (ECF No. 95.)

**B.      Factual Allegations in the Complaint and Supported by Declarations**

The Court turns to the allegations of the second amended complaint, the operative complaint in this action, and notes supporting testimony and documentation submitted through the application for default judgment and supporting materials.   (SAC; Decl. Robert Christofferson Supp. Appl. Default J. ("Robert Decl."), ECF No. 83; Mem. P & A Supp. Appl. Default J. ("Mem."), ECF No. 84; Req. Judicial Notice Supp. App. Default J. ("Req. Notice"), ECF No. 85.)   The Court's summary and comments made herein in this section are hereby incorporated into the Court's discussion section of this findings and recommendations below, infra Section III.

1.      The Parties Entered into Agreements for the Sale and Purchase of the Companies

In January of 2012, Plaintiffs were the owners of Defendant All Pure, a swimming pool servicing company in Fresno, California, and were interested in selling the company.  (Mem. 9; SAC ¶ 8; Robert Decl. ¶¶ 7, 12.)[6] Defendants the Carters and the Zavalas were interested in purchasing All Pure because they already owned APPS and wanted to add to their established pool business.  (Mem. 9; SAC ¶ 9; Robert Decl. ¶ 11.)

On January 3 and 5, 2012, Plaintiffs and Defendants the Carters and Zavalas entered into agreements to memorialize the terms of the purchase of All Pure, including: (1) a Stock Sale and Purchase Agreement dated January 3, 2012 (the "Agreement") (SAC ¶ 10, Ex. A, ECF No. 59-1

---

[5]  The hearing was held via videoconference due to the COVID-19 public health situation and associated limitations on physical access to the courthouse.  Plaintiffs were served with a notice setting the hearing.  (ECF Nos. 91, 92.) Information concerning the public phone line was posted on the public calendar, along with a directive to contact the courtroom deputy for videoconference access information.  The public phone line was available during the entirety of the hearing, and no appearances were made by Defendants, Defendants did not contact the courtroom deputy, and no filings prior to or after the hearing were made by Defendants.  (ECF No. 94.)

[6]  All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

at 1-59; Robert Decl. ¶ 14, Ex. A, ECF No. 83-1 at 1-59); (2) a Supplement to Stock Sale and Purchase Agreement dated January 3, 2012 (the "Supplement") (SAC ¶ 10, Ex. B, ECF No. 59-1 at 60-62; Robert Decl. ¶ 15, Ex. B, ECF No. 83-1 at 60-62); (3) a Promissory Note dated January 3, 2012 (the "Note"), in the amount of $975,000 (SAC ¶ 10, Ex. C, ECF No. 59-1 at 63-67; Robert Decl. ¶ 16, Ex. C, ECF No. 83-1 at 63-67); (4) a Consulting Agreement dated January 3, 2012 (the "Consulting Agreement") (SAC ¶ 10, Ex. D, ECF No. 59-1 at 68-71; Robert Decl. ¶ 17, Ex. D, ECF No. 83-1 at 68-71); (5) a Guaranty executed by All Pure in favor of Plaintiffs (the "All Pure Guaranty") (SAC ¶ 10, Ex. E, ECF No. 59-1 at 72-75; Robert Decl. ¶ 18, Ex. E, ECF No. 83-1 at 72-75); (6) a Guaranty executed by APPS in favor of Plaintiffs (the "APPS Guaranty") (SAC ¶ 10, Ex. F, ECF No. 59-1 at 76-80; Robert Decl. ¶ 19, Ex. F, ECF No. 83-1 at 76-80); (7) a Security Agreement executed by All Pure, as debtor, in favor of Plaintiffs (the "All Pure Security Agreement") (SAC ¶ 10, Ex. G, ECF No. 59-1 at 81-92; Robert Decl. ¶ 20, Ex. G, ECF No. 83-1 at 81-92); (8) a Security Agreement executed by APPS, as debtor, in favor of Plaintiffs (the "APPS Security Agreement") (SAC ¶ 10, Ex. H, ECF No. 59-1 at 93-104; Robert Decl. ¶ 21, Ex. H, ECF No. 83-1 at 93-104); and (9) a Security Agreement executed by the Carters and the Zavalas as debtors, in favor of Plaintiffs (the "Carter and Zavala Security Agreement") (SAC ¶ 10, Ex. I, ECF No. 59-1 at 105-110; Robert Decl. ¶ 22, Ex. I, ECF No. 83-1 at 105-110).  (Mem. 9.)

To perfect the All Pure Security Agreement and APPS Security Agreement, Plaintiffs recorded a UCC-1 financing statement with the California Secretary of State for the security agreements.  (SAC ¶ 11, Exs. J, K, ECF No. 59-1 at 111-120; Robert Decl. ¶ 23, Exs. J, K, ECF No. 83-1 at 111-120.)  Prior to the expiration of the UCC-1 financing statements, on January 4, 2017, Plaintiffs filed UCC continuation amendments, extending the UCC-1 financing statements through January 9, 2022.  (SAC ¶ 11, Exs. L, M, ECF No. 59-1 at 121-128; Req. Notice, Exs. 1-2, ECF No. 85 at 4-11.)[7]

---

[7]  The UCC-1 Financing Statements filed with the previous motion for default judgment had lapsed on January 9, 2017.  (ECF No. 30-1 at 112, 117.)  The Court ordered supplemental briefing to address the issue.  (ECF No. 40.)  On September 4, 2019, Plaintiffs filed supplemental briefing and a request for judicial notice of documents showing Plaintiffs had recorded continuation amendments extending the date of lapse until January 9, 2022.  (ECF Nos. 46, 48.)  Turning to the instant motion for default judgment, the UCC continuation amendments were not attached to the

To perfect Plaintiffs' security interest in the stock pledged in the Carter and Zavala Security Agreement, the Carters and the Zavalas each executed an "Assignment Separate from Certificate."  (SAC ¶ 12, Exs. N, O, ECF No. 59-1 at 129-132; Robert Decl. ¶ 24, Exs. L, M, ECF No. 83-1 at 121-124.)

### 2. Plaintiffs' Performance

On January 5, 2012, pursuant to the terms of the Agreement and the Supplement, Plaintiffs transferred a total of 2,000 shares of All Pure to the Carters and the Zavalas (1,000 shares to each), which constituted all of the shares of All Pure held by Plaintiffs.  (Mem. 10; SAC ¶ 13; Robert Decl. ¶ 25.)  Plaintiffs proffer that they have performed all terms and conditions of each of the agreements, including the Agreement, the Note, and the Consulting Agreement.  (Mem. 10; SAC ¶ 14.; Robert Decl. ¶ 26.)

### 3. Breach of the Agreement

First, pursuant to the terms of the Agreement, the Carters as Trustees,[8] the Zavalas, All Pure, and APPS, were required to purchase the inventory of All Pure at market value.  (Mem. 10; SAC ¶ 15; Robert Decl. ¶¶ 27-29.)  Plaintiff alleges the Defendants failed to pay for 972 bottles of acid that they took possession of in June of 2011, valued at $998.62, despite the continuous acknowledgment that this amount is due to Plaintiffs.  (Id.)

Second, pursuant to the terms of the Agreement, Plaintiffs were entitled to the balance of funds that existed in All Pure's checking account prior to the purchase, however, in or about March of 2012, after the close of the sale of All Pure, and without the consent or authorization of Plaintiffs, the Carters as Trustees, the Zavalas, All Pure, and APPS, withdrew $14,733.45 in such funds.  (Mem. 11; SAC ¶ 16; Robert Decl. ¶¶ 30-31.)  Defendants have failed to reimburse

---

second Amended Complaint nor the declaration of Plaintiff Robert.  Instead, counsel submitted such documentation in a request for judicial notice.  (ECF No. 85.)  The Court accepts the filing and takes judicial notice of: (1) the recorded UCC financing statement amendment/continuation filing number 17-75643301, which extended the lapse date to January 9, 2022 of original filing number 12-7296635667 (ECF No. 85 at 5-7); and (2) the recorded UCC financing statement amendment/continuation filing no. 17-75643291 which extended the lapse date to January 9, 2022 of original filing number 12-7296631128 (ECF No. 85 at 9-11).  See, e.g., Neilson v. Union Bank of California, N.A., 290 F. Supp. 2d 1101, 1114 (C.D. Cal. 2003).

[8]  The Carters were only signatories to the Agreement in their capacity as Trustees.  (ECF No. 83-1 at 2, 13.)

1   Plaintiffs for this amount despite acknowledging such an amount is due.  (SAC ¶ 16; Robert

2   Decl. ¶ 31; Decl. Darryl J. Horowitt Supp. Appl. Default J. ("Horowitt Decl."), Ex. 1, ECF No.

3   82 at 15.)

4           4.   Breach of the Note

5           Pursuant to the terms of the Note, the Carters (individually and Trustees), and the

6   Zavalas, were required to pay monthly payments on the first day of each month.  (Mem. 11; SAC

7   ¶ 17; Robert Decl., Ex. C.)  Plaintiffs contend that on October 1, 2017, the Carters and the

8   Zavalas failed to pay Plaintiffs the monthly payment due on the Note for October of 2017, and

9   thereafter Plaintiffs argue the Carters and the Zavalas continued to fail to pay the monthly

10   payments due on the Note for the months of November and December of 2017, as well as the

11   months of January, February, May, July, August, and September of 2018, and then continuing

12   through to the present as of the time of the filing of this action.  (Mem. 11; SAC ¶ 18; Robert

13   Decl. ¶¶ 33-37; Horowitt Decl.. Ex. 2, ECF No. 82 at 20.) [9]

14           Plaintiff Robert has kept an account history of all payments on the Note (the "Note

15   Ledger"), the Note Ledger has been provided to Plaintiffs' attorney for the calculation of interest

16   penalties, and Robert declares that Defendants made "no further payments thereafter until the

17   two $100,000.00 payments made in September 2019." [10]  (Robert Decl. ¶¶ 35-36, Ex. N, ECF No.

18   36-1 at 125-129.)  Plaintiffs argue the breach of the Note accelerated the full balance due on the

19   Note in the sum of $798,375.52 as of June 1, 2018, plus late fees in the amount of $450.00.

20   (Robert Decl. ¶ 37.)

21           5.   Breach of the Consulting Agreement

22           Pursuant to the terms of the Consulting Agreement, Plaintiffs allege All Pure was

23   required to pay to Plaintiff Robert Christofferson the sum of $600,000.00 for consulting services,

---

[9]  The Court has reviewed the ledgers, and although Plaintiffs state that payments were missed for October of 2017 and January of 2018, it appears payments are noted for October of 2017 and January of 2018, however the October payment is noted as late and states it was received in November.  (ECF No. 83-1 at 133.)  Nonetheless, it appears both of these payment are correctly included in the amortization calculation program and spreadsheet utilized by counsel.  (ECF No. 82 at 56-57.)

[10]   Further, as discussed herein, immediately prior to the hearing on the motion for default judgment, Plaintiffs notified the Court of two additional payments totaling $6,000.00.  (ECF Nos. 93, 95.)

payable in monthly installments in the amount of $5,000.00, commencing February 1, 2012, and continuing on the first of each month until the full sum of $600,000.00 is paid.  (SAC ¶ 20; Robert Decl. ¶ 38.)  Plaintiffs allege that on October 1, 2017, All Pure failed to pay to Plaintiffs the monthly payment due, and thereafter, continued to fail to timely pay the monthly payments due on the Consulting Agreement for the months of November and December of 2017, and January, February, May, July, August, and September of 2018, and continuing thereafter.  (Mem. 12; SAC ¶ 20; Robert Decl. ¶ 40-42.) [11]

The Consulting Agreement further provides that any breach of the Note would also constitute a breach of the Consulting Agreement, and thus by virtue of the breach of the Note, "the Carters and Zavalas have further breached the terms of the Consulting Agreement."  (Mem. 12; Robert Decl., Ex. D.; SAC ¶ 22.)[12]

Plaintiff Robert declares he has kept an account history of all payments on the Consulting Agreement (the "Consulting Ledger"), the Consulting Ledger has been provided to Plaintiffs' attorney for the calculation of interest penalties, and Robert declares that a total of eighteen payments have been missed.  (Robert Decl. ¶¶ 42-44, Ex. O, ECF No. 36-1 at 130-136.)  Plaintiffs allege the total amount owed for breach of the Consulting Agreement is $240,000.00,[13]

---

[11]  All Pure was a party to the Consulting Agreement, however the Carters and Zavalas were not parties, and All Pure was not named in the third cause of action for breach of the Consulting Agreement in the original complaint nor the first amended complaint.  In the previously filed motion for default judgment, Plaintiffs alleged the Carters and Zavala were liable under the Consulting Agreement, however, at the hearing discussed the issue that only All Pure was a party to the Consulting Agreement, and All Pure was not named in the third cause of action for breach of the Consulting Agreement.  All Pure is now named in the third claim for relief for breach of the Consulting Agreement.  (SAC at 9-10, ¶¶ 40-45.)  The Court notes that Plaintiff Robert's declaration still erroneously states that it was the Carters and Zavalas that failed to make the monthly payments.  (Robert Decl. ¶¶ 38-43.)  However, this error does not impact the Court's ultimate finding of a breach by All Pure.

[12]  It is unclear here whether Plaintiffs meant to state that All Pure had breached the Consulting Agreement, as it is All Pure that is the direct party to the Consulting Agreement.

[13]  The Court has reviewed the Consulting Ledger, and notes that the formatting appears inconsistent and is difficult to decipher because the columns are cutoff and appear on different pages.  Nonetheless, it appears that that, in line with the Court's review of the Note Ledger above, the payment for October 2017 was in fact paid, although it was marked late and paid on November 4, 2017.  (ECF No. 83-1 at 133, 136.)  Additionally, the Consulting Ledger reflects a payment was in fact made in January of 2018.  (Id.)  It appears that the Consulting Ledger ends after a non-payment is entered for May of 2018.  (ECF No. 83-1 at 133.)  The Consulting Ledger reflects a total of four entries where a notation of "no consulting fees paid" is entered: (1) November 2017; (2) December 2017; (3) February 2018; and (4) May 2018.  (ECF No. 83-1 at 133.)  Despite the incomplete entries for missed payments, the Consulting Ledger appears to accurately reflect the total paid by Defendants under the Consulting Agreement in the amount of $360,000.00 ( [$55,000.00 for 2012] + [$60,000.00 for 2013] + [$60,000.00 for 2014] + [60,000.00 for

plus late fees in the amount of $450.00,[14] for the eighteen missed payments.  (Mem. 12; Robert Decl. ¶ 43; SAC ¶ 43.)

      6.    <u>Breach of the Guaranties</u>

Plaintiffs contend that pursuant to the terms of the guaranties signed by All Pure and APPS, each guarantor guaranteed performance of the Agreement, the Note, and the Consulting Agreement, and in the event of a breach by the Carters or Zavalas on either the Note and/or Consulting Agreement, the guarantors were obligated to pay to Plaintiffs the amounts owed under the Agreement, Note and/or the Consulting Agreement.  (Mem. 12; SAC ¶ 23; Robert Decl. ¶¶ 49-52.)[15]  Because of the breach of the Note and Consulting Agreement, ALL Pure and APPS are obligated to pay to Plaintiffs all amounts owed, but not paid by the Carters and Zavalas.  (<u>Id.</u>)  Despite demand, All Pure and APPS have not paid the money owed under the guaranties.  (<u>Id.</u>)

---

2015] + [$60,000.00 for 2016] + [$50,000.00 for 2017] + [$15,000.00 for 2018] ), leaving a total of $240,000.00 out of the original $600,000.00 of principal balance remaining unpaid.  (ECF No. 83-1 at 134-136.)  In the previous motion for default judgment and supporting materials, Plaintiffs demanded a lesser amount, $220,125.00 in principal owed, in addition to $450.00 in late fees for eighteen missed payments, for a total of $220,575.00, in the previous filings.  (ECF No. 34 at 13)  At the hearing held on the previous motion for default judgment, the Court highlighted this accounting issue.  Plaintiffs have now addressed this discrepancy and now agree $240,000.00 in principal balance remains.  (Robert Decl. ¶ 43.)

[14]  As the Court noted at the June 10, 2020 hearing, Plaintiffs apparently omitted these late fees from the calculation of damages.  At the hearing, counsel acknowledged these fees were in fact omitted and Plaintiffs accept their omission, and thus those fees are not included in the damages calculation below.  (ECF No. 94.)

[15]  Plaintiff's memorandum first states the guaranties guaranteed performance of the Agreement, but then excluded the Agreement from the next sentence stating the amounts the guarantors were obligated to pay.  (Mem. 12.)  The Court notes that the All Pure Guaranty first only refers to the Carters in the Trustee capacity, but then Debtor is defined to include the Carters in both capacities.  (ECF No. 59-1 at 73.)  The All Pure Guaranty defines indebtedness "in its most comprehensive sense," and expressly includes the Note, "and any and all advances, debts, obligations, and liabilities made, incurred, or created previously, now or later . . . "  (ECF No. 59-1 at 73.)  The APPS Guaranty similarly defines indebtedness, but also expressly includes the Consulting Agreement in the definition.  (ECF No. 59-1 at 77.)  The APPS Guaranty appears to mistakenly omit Defendant Julie Zavala from the definition of Debtor, although Julie Zavala is mentioned in the prior sentence.  (ECF No. 59-1 at 77.)  Further the Court notes that the APPS Guaranty provides that if "Guarantor is not i[n] default under this Guaranty Agreement, and further provided there is no Event of Default under that certain Promissory Note . . . and finally provided there is no item of default by Debtor under that certain Consulting Agreement . . . then this Guaranty Agreement will terminate on January 3, 2015."  (ECF No. 59-1 at 79.)  The All Pure Guaranty does not appear to have such provision.  (ECF No. 59-1 at 73-75.)  Plaintiffs contend the Note and Consulting Agreement were breached on October of 2017, after this referenced date, but do contend the Agreement was breached as early as 2011.  (Robert Decl. ¶¶ 27-43.)  The Court declines to further wade into the potential import of these facts, given Defendants have not appeared in this action and have not mounted any challenge to the enforcement of these agreements, and thus admitted all material facts alleged in Plaintiff's complaint.  <u>See</u> <u>Garamendi</u>, 683 F.3d at 1080; <u>PepsiCo, Inc. v. California Sec. Cans</u>, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ("Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages.").

While Plaintiffs' memorandum does not specify that it was All Pure that would have breached the Consulting Agreement and not the Carters and Zavalas (Mem. 12), the second amended complaint specifies that APPS guarantied All Pure's performance of the Consulting Agreement, and specifies that in the event of a breach by the Carters (individually or Trustees), the Zavalas in either the Agreement and/or Note, or All Pure's breach of the Consulting Agreement, the guarantors were obligated to pay Plaintiffs the amounts owed by the Carters (individually and as Trustees), and the Zavalas under the Agreement and/or Note, and All Pure under the Consulting Agreement.  (SAC ¶ 23.)

By the failure of APPS and All Pure to pay Plaintiffs the amounts due under these agreements, APPS and All Pure are in breach of the terms of the guaranties.  (Robert Decl. ¶ 52.) Plaintiffs contend that except for two additional $100,000.00 payments made in September of 2019, no other payments have been made, leaving the principal sum of $1,009,819.80, exclusive of interest, late fees, attorneys' fees, and costs.  (Robert Decl. ¶ 51.)[16]

       7.   <u>Breach of the Security Agreements</u>

The All Pure Security Agreement, the APPS Security Agreement, and the Carter and Zavala Security Agreement (collectively the "Security Agreements"), each provide that any failure to pay Plaintiffs the amount owed under the Note, the Consulting Agreement, or both, would constitute a breach of the respective security agreement.  (Mem. 12; SAC ¶ 25; Robert Decl., Exs. G, H, I.)  The Security Agreements further provide that in the event of a default, Plaintiffs could exercise all rights a secured party can exercise under the California Commercial Code, including assembling the collateral identified in the respective security agreement and allowing Plaintiffs to enter their business locations to take possession of such collateral, giving notice of public or private sale, disposing of collateral in a commercially reasonable manner and applying the proceeds of the sale to the amounts due and owing as a result of the breach of the Security Agreements.  (Mem. 13; SAC ¶ 26.)

Plaintiffs argue that by failing to pay Plaintiffs the amounts owed under the Note and the

---

[16]  Again, immediately prior to the hearing on this motion, Plaintiffs' notified the Court of additional payments totaling $6,000.00 made by Defendants.  (ECF Nos. 93, 95.)

Consulting Agreement, Defendants have breached the terms of the respective security agreements.  (Mem. 13; SAC ¶ 27; Robert Decl. ¶ 44.)  Thus, Plaintiffs charge that Defendants were obligated to assemble all of the collateral identified in the respective security agreements and allow Plaintiffs to enter their business locations and take possession of the collateral.  (Mem. 13; SAC ¶ 28; Robert Decl. ¶ 44-48.)  In Plaintiff Robert's declaration, the presumptive location of the collateral is identified as 3237 E. Malaga, Fresno, California 93725, or another location only known to Defendants.  (Robert Decl. ¶ 46.)  Robert declares a belief that none of the collateral is being held by Defendants for any tax purpose, and believes the current market value is less than $500,000.00.  (Robert Decl. ¶¶ 47-48.)

8.   Notification of Breach, Demand for Payment, and Payments Completed

On January 24, 2018, Plaintiffs' counsel provided written notice to Defendants notifying them of the breaches of the agreements underlying this action, and requesting performance under the agreements, requesting turnover of the property identified as collateral in the agreements, and requesting full payment due under the guaranties.  (Robert Decl. ¶ 53; Horowitt Decl., Ex. 1.)

Since the drafting of the second amended complaint, Defendants have submitted two separate payments in the amount of $100,000.00.  (Robert Decl. ¶ 54.)  The first was received on September 10, 2019, and the second payment was received on September 25, 2019.  (Id.)  Robert declares he has deferred to counsel on how to apply these payments to the amount owed and counsel has calculated the amounts owed in interest and principal.  ( Mem. 13; Horowitt Decl. ¶¶ 33-45.)  Further, immediately prior to the hearing on this motion, Plaintiffs' notified the Court of additional payments totaling $6,000.00 made by Defendants, and submitted additional calculations of damages based on these additional payments.  (ECF Nos. 93, 95.)

## II.

## LEGAL STANDARD FOR DEFAULT JUDGMENT

"Our starting point is the general rule that default judgments are ordinarily disfavored," as "[c]ases should be decided upon their merits whenever reasonably possible."  NewGen, LLC v. Safe Cig, LLC, 840 F.3d 606, 616 (9th Cir. 2016) (quoting Eitel v. McCool, 782 F.2d 1470, 1472 (9th Cir. 1986).  Pursuant to Federal Rules of Civil Procedure 55, obtaining a default

judgment is a two-step process.  Entry of default is appropriate as to any party against whom a judgment for affirmative relief is sought that has failed to plead or otherwise defend as provided by the Federal Rules of Civil Procedure and where that fact is made to appear by affidavit or otherwise.  Fed. R. Civ. P. 55(a).  After entry of default, a plaintiff can seek entry of default judgment.  Fed. R. Civ. P. 55(b). Federal Rule of Civil Procedure 55(b)(2) provides the framework for the Court to enter a default judgment:

> (b) Entering a Default Judgment.
>
>> (2) By the Court. In all other cases, the party must apply to the court for a default judgment. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared. If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to:
>>
>>> (A) conduct an accounting;
>>>
>>> (B) determine the amount of damages;
>>>
>>> (C) establish the truth of any allegation by evidence; or
>>>
>>> (D) investigate any other matter.

Fed. R. Civ. P. 55.

The decision to grant a motion for entry of default judgment is within the discretion of the court.  PepsiCo, Inc. v. California Security Cans, 238 F.Supp.1172, 1174 (C.D. Cal. 2002).  The Ninth Circuit has set forth the following seven factors (the "Eitel factors") that the Court is to consider in exercising its discretion:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

Eitel, 782 F.2d at 1471-72.

Generally, once default has been entered, "the factual allegations of the complaint, except those relating to damages, will be taken as true."  Garamendi v. Henin, 683 F.3d 1069, 1080 (9th Cir. 2012) (quoting Geddes v. United Fin. Grp., 559 F.2d 557, 560 (9th Cir. 1977)); see also Fed.

R. Civ. P. 8(b)(6) ("An allegation--other than one relating to the amount of damages--is admitted if a responsive pleading is required and the allegation is not denied.").  "However, necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default."  Cripps v. Life Ins. Co. of North America, 980 F.2d 1261, 1267 (9th Cir. 1992) ("In reviewing a default judgment, this court must take the well-pleaded factual allegations of [the complaint] as true.").  Accordingly, the amount of damages must be proven at an evidentiary hearing or through other means.  Microsoft Corp. v. Nop, 549 F.Supp.2d 1233, 1236 (E.D. Cal. 2008).  The relief sought must not be different in kind or exceed the amount that is demanded in the pleadings.  Fed. R. Civ. P. 54(c).

### III.

### DISCUSSION

Plaintiffs seek default judgment and request monetary damages, property offered as collateral through the security agreements, attorneys' fees, and costs.  The Court first determines whether the Court properly has jurisdiction in this matter, and then turns to the Eitel factors to determine the appropriateness of entering default judgment.

### A.    Jurisdiction

Initially, the Court considers whether it has jurisdiction in this action.  Plaintiffs brought this action pursuant to 28 U.S.C. § 1332.  District courts have original jurisdiction of all civil actions between citizens of different States in which "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."  28 U.S.C. § 1332(a).  This requires complete diversity of citizenship and the presence "of a single plaintiff from the same State as a single defendant deprives the district court of original diversity jurisdiction over the entire action."  Abrego v. The Dow Chemical Co., 443 F.3d 676, 679 (9th Cir. 2006) (citations omitted).  A corporation is deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business.  Lincoln Prop. Co. v. Roche, 546 U.S. 81, 94 (2005) (citing 28 U.S.C. § 1332(c)(1)).

Plaintiffs are citizens of the State of Florida.  (SAC ¶¶ 1, 3; Robert Decl. ¶ 5-6.) Defendant All Pure is a California corporation and its principal place of business is the County of

Fresno, California.  (SAC ¶ 4; Robert Decl. ¶ 10.)  Defendant APPS is a California corporation with its principal place of business in the County of Los Angeles, California.  (SAC ¶ 5; Robert Decl. ¶ 10.)  Defendants the Carters are citizens of the State of California.  (SAC ¶ 6; Robert Decl. ¶ 9.)  Defendants the Zavalas are citizens of the State of Colorado.  (SAC ¶ 7; Robert Decl. ¶ 8.)

Absent an attack to the allegations in the complaint, the allegations of citizenship are accepted as true.  NewGen, LLC, 840 F.3d at 610.  As Plaintiffs are citizens of Florida and Defendants are citizens of California and Colorado, complete diversity of citizenship exists.  The amount in controversy in the is action is well beyond $75,000.00, so the jurisdictional requirement is met.  (SAC at 19-22)

Accordingly, the Court finds that it has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

### B.      Procedural Requirements

"A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared."  Fed. R. Civ. P. 55.  In counsel's declaration in support of the request for entry of default, counsel declares that none of the Defendants are minors, incompetent persons, persons in the military, or otherwise exempt from default judgment.  (Decl. Darryl Horowitt Supp. Req. Entry Default ¶ 5, ECF No. 73.)

As a general rule, the Court considers the adequacy of service of process before evaluating the merits of a motion for default judgment.  See J & J Sports Prods., Inc. v. Singh, No. 1:13-CV-1453-LJO-BAM, 2014 WL 1665014, at *2 (E.D. Cal. Apr. 23, 2014); Penpower Tech. Ltd. v. S.P.C. Tech., 627 F. Supp. 2d 1083, 1088 (N.D. Cal. 2008); Mason v. Genisco Tech. Corp., 960 F.2d 849, 851 (9th Cir. 1992) (stating that if party "failed to serve [defendant] in the earlier action, the default judgment is void and has no res judicata effect in this action.").  Service of the summons and complaint is the procedure by which a court having venue and jurisdiction of the subject matter of the suit obtains jurisdiction over the person being served.  Mississippi Publishing Corp. v. Murphree, 326 U.S. 438, 444–45 (1946); see Direct Mail

1  Specialists, Inc. v. Eclat Computerized Techs., Inc., 840 F.2d 685, 688 (9th Cir. 1988) ("A

2  federal court does not have jurisdiction over a defendant unless the defendant has been served

3  properly under Fed. R. Civ. P. 4.").

4       "Rule 4 is a flexible rule that should be liberally construed so long as a party receives

5  sufficient notice of the complaint." Direct Mail, 840 F.2d at 688 (quoting United Food &

6  Commercial Workers Union v. Alpha Beta Co., 736 F.2d 1371, 1382 (9th Cir. 1984)).  However,

7  "without substantial compliance with Rule 4, 'neither actual notice nor simply naming the

8  defendant in the complaint will provide personal jurisdiction.' " Direct Mail, 840 F.2d at 688

9  (quoting Benny v. Pipes, 799 F.2d 489, 492 (9th Cir.1986)).   "Once service is challenged,

10  plaintiffs bear the burden of establishing that service was valid under Rule 4." Brockmeyer v.

11  May, 383 F.3d 798, 801 (9th Cir. 2004) (citations omitted).   "[A] signed return of service

12  constitutes prima facie evidence of valid service which can be overcome only by strong and

13  convincing evidence." SEC v. Internet Solutions for Bus., Inc., 509 F.3d 1161, 1163 (9th Cir.

14  2007).

15       As described above, Plaintiffs have submitted signed returns of service demonstrating

16  Defendants were served with the second amended complaint, the operative complaint in this

17  action.  (ECF Nos. 64, 65, 66, 67, 68, 69, 70, 71.)  No challenges to service have been presented

18  to the Court.  The Court finds it has proper jurisdiction over Defendants.

19       On March 4, 2020, the Clerk of the Court entered default against Defendants: (1) APPS;

20  (2) All Pure; (3) Jack Carter; (4) Susie Carter; (5) Julie Zavala; and (6) Phil Zavala.  (ECF Nos.

21  74, 75 76, 77, 78, 79.)[17]

22  _____

23  [17]  As noted above, both the request for entry of default and supporting declaration refer to all Defendants generally, however, they only refer to Defendants Jack Carter and Susie Carter as Trustees and do not expressly refer to them

24  in their individual capacity in the first portion of the document containing the initial text of the request.  (ECF Nos. 72, 73.)  The second portion of each of the documents do refer to  Jack Carter and Susie Carter as being served in both their individual and Trustee capacities, and refer to all defendants generally as "Defendants." (Id.)  The Court

25  recommends construing and accepting the requests for entry of default and entries of default against Jack Carter and Susie Carter as encompassing and providing notice against them in both their individual and Trustee capacities,

26  given they were named in both capacities in the second amended complaint and served in both capacities, the requests for entry of default reference such service in both capacities, and requested entry of default against all

27  Defendants in the Second Amended Complaint.  These Defendants were sufficiently on notice, and the entries of default do not delineate between their capacities, and entered default against "Jack Carter," and Susie Carter."  The Court notes that when Jack Carter and Susie Carter were previously only named in their capacities as Trustees, the

28  entry of default similarly did not identify the default was taken in the Trustee capacity.  (ECF No. 22.)

**C.     The Eitel Factors Weigh in Favor of Granting Default Judgment**

As discussed below, the Court finds that consideration of the Eitel factors weighs in favor of granting default judgment in favor of Plaintiffs.

### 1.     Prejudice to Plaintiffs if Default Judgment is Not Granted

Plaintiff originally filed this action on October 4, 2018.  (ECF No. 1.)  If default judgment is not entered, Plaintiffs are effectively denied a remedy for the violations alleged until such time as the Defendants in this action decide to appear in the litigation, which may never occur.  As described above, all Defendants named in this action were served with the operative complaint, and summonses were returned executed.  (ECF Nos. 64, 65, 66, 67, 68, 69, 70, 71.)  No Defendants have filed a responsive pleading or otherwise appeared in the action, none have filed objections challenging service or any opposition to the instant motion for default judgment, and none appeared for the hearing on the instant application.  (ECF No. 94.)  The Court highlights that on January 24, 2019, Plaintiffs filed a notice of conditional settlement, which while not executed, evidences the fact that the Defendants were in fact involved in negotiations with Plaintiffs, yet despite the apparent breakdown in the settlement negotiations, have nonetheless failed to make an appearance in this action.  (ECF No. 13.)  Plaintiffs have also made additional payments in September of 2019, following the filing of the second amended complaint, and further payments after the filing and service of the motion for default judgment, and thus appear aware of this ongoing litigation and pending motion for default judgment.  (ECF Nos. 92, 93, 95.)

Plaintiffs have alleged ongoing breaches of various agreements involving substantial amounts of money over a long period of time, Plaintiffs provided notice and made demand for performance prior to filing lawsuit, and properly pursued their claims and entered default.  For all of these reasons, the Court finds Plaintiffs would be substantially prejudiced if default judgment is not granted and finds this Eitel factor weighs in favor of granting default judgment in favor of Plaintiffs.

### 2.     The Merits of Plaintiffs' Substantive Claims and Sufficiency of Complaint

The second and third Eitel factors instruct the Court to evaluate the merits of the

substantive claims alleged in the complaint as well as the sufficiency of the complaint itself.  It is appropriate for the Court to analyze these two factors together.  AMUR Equip. Fin., Inc. v. CHD Transp. Inc., No. 117CV00416AWISKO, 2017 WL 5477379, at *5 (E.D. Cal. Nov. 15, 2017); F.D.I.C. v. Quest, F.S., Inc., No. SACV 10-00710 DOC, 2011 WL 2560428, at *2 (C.D. Cal. June 27, 2011).  In doing so, the Court looks to the complaint to determine if the allegations contained within are sufficient to state a claim for the relief sought.  Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978).

Above, infra Section I(B), the Court summarized the allegations contained in the second amended complaint and correlated the testimonial support from Plaintiff Robert's declaration, and counsel Horowitt's declaration, that were submitted in support of the application for default judgment.  The Court incorporates Section I(B) here by way of reference.

### a.   Plaintiffs' Causes of Action for Breach of Contract

The first cause of action is by all Plaintiffs against the Carters in their capacity as Trustees only, the Zavalas, All Pure, and APPS, for breach of the Agreement.  (SAC ¶¶ 29-33.) The second cause of action is by all Plaintiffs against the Carters individually and as Trustees, and the Zavalas, for breach of the Note.  (SAC ¶¶ 34-39.)  The third cause of action is by Plaintiff Robert against All Pure for breach of the Consulting Agreement.  (SAC ¶¶ 40-45.)[18]

Under California law, the elements for a cause of action for breach of contact are: (1) the contract; (2) a plaintiff's performance or excuse for nonperformance; (3) a defendant's breach of the contract; and (4) damage to plaintiff resulting from the breach.  Prop. California SCJLW One Corp. v. Leamy, 25 Cal.App.5th 1155, 1162, 236 Cal.Rptr.3d 500, 505 (Ct. App. 2018).

Plaintiffs have established the entering into and existence of: (1) the Agreement, dated January 3, 2012, between Plaintiffs and the Carters as Trustees, the Zavalas, All Pure, and APPS; (2) the Note, dated January 3, 2012, between Plaintiffs and the Carters individually and as Trustees, and the Zavalas, jointly and severally agreeing to the payment obligations of the Note;

---

[18]  The original complaint and first amended complaint did not name Defendant All Pure in the third cause of action for breach of the Consulting Agreement.  (ECF Nos. 1, 30.)  Following the concerns voiced at the hearing on the previous motion for default judgment, Plaintiffs now name All Pure in the third cause of action.  (ECF No. 59.)

and (3) the Consulting Agreement, dated January 3, 2012, between Plaintiff Robert Christofferson and Defendant All Pure.  (SAC ¶ 10, Exs. A, C, D; Robert Decl. ¶¶ 14, 16, 17, Exs. A, C, D.)

Plaintiffs have established that they performed their obligations under the Agreement, the Note, and the Consulting Agreement.  (Mem. 15; SAC ¶¶ 13-14; Robert Decl. ¶¶ 25-26.)

Plaintiffs have alleged and demonstrated breach of the Agreement by the Carters as Trustees, the Zavalas, All Pure, and APPS, for: (1) retaining inventory without payment; and (2) improper withdrawal of bank account funds, and retention of the funds despite demand.  (SAC ¶¶ 15-16; Robert Decl. ¶¶ 27-31.)[19]  Plaintiffs have alleged and demonstrated breach of the Note by the Carters as Trustees and individually, and the Zavalas.  (SAC ¶¶ 17-18; Robert Decl. ¶¶ 33-37, Ex. N.)  Plaintiffs have alleged and demonstrated breach of the Consulting Agreement by All Pure.  (SAC ¶¶ 20-22; Robert Decl. ¶¶ 38-43.)[20]

Plaintiffs have sufficiently alleged and demonstrated damages flowing from the breach of the Agreement, breach of the Note, and breach of the Consulting Agreement.  (SAC ¶¶ 15-22; Robert Decl. ¶¶ 27-43.)

In addition to attaching the agreements as exhibits to the complaint, Plaintiffs have also submitted a declaration and exhibits in support of the instant motion for default judgment. Defendants have failed to respond to Plaintiffs' complaint and thus have admitted these allegations.  See Garamendi, 683 F.3d 1069 at 1080; Fed. R. Civ. P. 8(b)(6).  For all of these reasons, the second and third Eitel factors weigh in favor of entering default judgment on: (1) Plaintiffs' first cause of action for breach of the Agreement against the Carters as Trustees only, the Zavalas, All Pure, and APPS; (2) Plaintiffs' second cause of action for breach of the Note against the Carters as Trustees and individually, and the Zavalas; and (3) Plaintiff Robert's third

---

[19]  Although the second amended complaint and memorandum reference all Defendants, Plaintiff Robert's declaration only references the Carters and Zavalas as not paying for the inventory and withdrawing the funds. And only references All Pure as retaining the funds.  (Robert Decl. ¶¶ 27-31.)

[20]  As discussed above, while the second amended complaint was amended to reflect the fact that only Defendant All Pure was a party to the Consulting Agreement, Plaintiff Robert's declaration still refers to the Carters and Zavalas as failing to adhere to the Consulting Agreement.  Nonetheless, the Court finds Plaintiffs have established breach by All Pure.

1   cause of action against All Pure for breach of the Consulting Agreement.

2       **b.      Plaintiffs' Causes of Action for Breach of Guaranty**

3       Plaintiffs' fourth cause of action is against All Pure for breach of guaranty under the All

4   Pure Guaranty, and Plaintiffs' fifth cause of action is against APPS for breach of guaranty under

5   the APPS Guaranty.  (SAC ¶¶ 46-61.)

6       Under California law, the elements for a breach of guaranty claim are generally the same

7   as the elements for a breach of contract claim: (1) existence of the guaranty agreement; (2)

8   plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) resulting

9   damage to plaintiff.  TBK Bank, SSB v. Singh, No. 117CV00868LJOBAM, 2018 WL 1064357,

10  at  *4  (E.D.  Cal.  Feb.  23,  2018),  report  and  recommendation  adopted,  No.

11  117CV00868LJOBAM, 2018 WL 3055890 (E.D. Cal. Mar. 21, 2018); Alwood v. Montecalvo,

12  No. CV1408139MMMPJWX, 2015 WL 13306204, at *6 (C.D. Cal. Nov. 3, 2015); Rancho

13  Mountain Properties, Inc. v. Gray, No. 11-CV-00358 BEN BLM, 2012 WL 1192755, at *2 (S.D.

14  Cal. Apr. 9, 2012), aff'd, 578 F. App'x 662 (9th Cir. 2014).

15      Plaintiffs have established the entering into and the existence of the guaranty contracts:

16  (1) the All Pure Guaranty was executed by All Pure in favor of Plaintiffs on January 3, 2012; and

17  (2) the APPS Guaranty was executed by APPS in favor of Plaintiffs on January 3, 2012.  (SAC ¶

18  10, Exs. E, F; Robert Decl. ¶¶ 18-19, Exs. E, F.)  Plaintiffs have established that they performed

19  their obligations under these agreements.  (SAC ¶ 14; Robert Decl. ¶ 26.)  The Court also finds

20  Plaintiffs have established breach of the guaranties and damages flowing from breach of the

21  guaranties.  (SAC ¶¶ 23-24, 46-61; Robert Decl. ¶¶ 49-52.)  Plaintiffs allege that pursuant to the

22  terms of each of the guaranties signed by All Pure and APPS, each guarantor guaranteed

23  performance of the Agreement and the Note, and in the event of a breach by the Carters or

24  Zavalas in paying the Note, the guarantors were obligated to pay to Plaintiffs the amounts owed

25  by the Carters and the Zavalas.  (SAC ¶ 23-24, 46-61; Robert Decl. ¶¶ 49-52.)  The Court finds

26  that Plaintiffs have established breach of the guaranties through breach of the Note and

27  Agreement and failure of the guarantors to pay the amount due under the Note and Agreement

28  following the breach.  (Id.)

Additionally, under the APPS Guaranty, APPS guaranteed All Pure's performance of the Consulting Agreement, and in the event of a breach by All Pure in paying the amounts due under the Consulting Agreement, APPS was obligated to pay Plaintiffs the amount owed by All Pure under the Consulting Agreement.  (SAC ¶¶ 54-61; Robert Decl. ¶¶ 49-52.)  Plaintiffs have adequately established breach of the APPS Guaranty (Robert Decl. ¶¶ 51-52), and thus the Court finds that Defendant APPS is also liable for the balance due under the Consulting Agreement under the APPS Guaranty.

Accordingly, the Court finds these factors weigh in favor of granting default judgment in favor of Plaintiffs fourth cause of action for breach of the All Pure Guaranty and imposing liability of All Pure for the obligations of the Carters and Zavalas under the Note and Agreement. Additionally, the Court finds these factors weigh in favor of granting default judgment in favor of Plaintiffs' eighth cause of action for breach of the APPS Guaranty and imposing liability on APPS for the obligations of the Carters and Zavalas under the Note and Agreement, as well as the liability of All Pure under the Consulting Agreement.

### c. Plaintiffs' Causes of Action for Possession of Personal Property Pursuant to the Security Agreements

Plaintiffs' sixth cause of action is against All Pure for possession of personal property, seeking the return of collateral secured under the All Pure Security Agreement and acquired through entering into the Agreement, Note, Consulting Agreement, and All Pure Security Agreement.  (SAC ¶¶ 62-68.)  Plaintiffs' seventh cause of action is against APPS for possession of personal property, seeking the return of collateral secured under the APPS Security Agreement and acquired through entering into the Agreement, Note, Consulting Agreement, Guaranties, and APPS Security Agreement.  (SAC ¶¶ 69-75.)  Plaintiffs' eighth cause of action is against the Carters, as trustees and individually, and the Zavalas, for possession of personal property, seeking return of collateral secured under the Carter and Zavala Security Agreement, the Agreement, Note, Consulting Agreement, and Guaranties.  (SAC ¶¶ 76-83.)

In briefing, Plaintiffs cite the elements for conversion as follows: (1) Plaintiffs have the right to the property; (2) Defendants interfered with Plaintiffs' rights to the property by

knowingly or intentionally refusing to return the property upon demand; (3) Plaintiffs did not consent to the Defendants' interference; (4) harm to Plaintiffs; and (5) Defendants' conduct was a substantial factor in causing Plaintiffs' harm.  (Mem. 19, citing Judicial Council of California Civil Jury Instruction 2100; Cal. Civ. Code §§ 1712; 3379.)  Plaintiffs also cite the remedy of claim and delivery, and California Commercial Code § 9601 for its provision allowing reduction of a claim to judgment, foreclosure, or other enforcement after default.  (Mem. 20-21.)

The Court finds the complaint and moving papers sufficiently allege and demonstrate Plaintiffs are entitled to return of the personal property secured by the security agreements and described therein.[21]  "One who wrongfully withholds personal property from another who is

---

[21]   Despite not expressly labeling their cause of action as one of conversion but rather possession of personal property, because the complaint presents all elements of a cause of action for conversion pursuant to the security agreements, the Court may construe the claim as conversion despite the labeling of the cause of action.   See Sateriale v. R.J. Reynolds Tobacco Co., 697 F.3d 777, 782 (9th Cir. 2012) ("We focus on the substance of the plaintiffs' claims, not the plaintiffs' labels."); Sholiay v. Fed. Nat. Mortg. Ass'n, No. CIV 2:13-00958, 2013 WL 5569988, at *3 (E.D. Cal. Oct. 9, 2013) (citing Sateriale and construing wrongful foreclosure claim as a breach of contract claim), aff'd, 627 F. App x 654 (9th Cir. 2015); SMSW Enterprises, LLC v. Halberd Corp., No. CV 13-01470 BRO SPX, 2015 WL 1457605, at *8 (C.D. Cal. Mar. 30, 2015) (construing claim labelled injunctive relief as one for breach of contract as the substance of the allegations contained such elements); China Cent. Television v. Create New Tech. (HK) Ltd., No. CV1501869MMMAJWX, 2015 WL 12732432, at *11 (C.D. Cal. Dec. 7, 2015) (despite plaintiffs' labeling of claim as trademark infringement and unfair competition, [g]iven the content of the allegations that comprise the cause of action, the court construe[d] the claim as a false designation of origin claim."); Zekelman Indus. Inc. v. Marker, No. CV-19-02109-PHX-DWL, 2020 WL 1495210, at *7 (D. Ariz. Mar. 27, 2020) (despite describing "claim for 'unfair competition'—a term that doesn't appear in the text of  Section 1125(a) . . . because paragraph 90 of the complaint contains a specific reference to 'a false designation of origin,' and because (as discussed below) the liability analysis under  Section 1125(a)(1)(A) is relatively straightforward, the Court will construe Count Three as a false designation claim."); Hisamatsu v. Niroula, No. C-07-04371-JSW EDL, 2009 WL 4456392, at *5 (N.D. Cal. Oct. 22, 2009) (although plaintiff "should have brought an action for the bounced check under that statutory provision as opposed to a 'tort in action' claim . . . pursuant to Federal Rule of Civil Procedure 8, '[p]leadings should be construed so as to do justice,' and therefore the Court may construe the claim as one brought under section 1719."), report and recommendation adopted in part sub nom. Hisamaatsu v. Niroula, No. C 07-04371 JSW, 2009 WL 4456391 (N.D. Cal. Nov. 30, 2009); Diversified Prod. Indus. Ltd. v. Skyline Steel, LLC, No. CV0803288GAFMANX, 2009 WL 10698408, at *3 (C.D. Cal. Mar. 11, 2009) ("The Court treats the 'anticipatory breach of contract' claim as falling under the general breach of contract claim.  In addition, the Court construes Plaintiff's negligent interference claim (count eight) as a negligent interference with prospective economic advantage claim because it does not appear that a claim of negligent interference with contract is cognizable under California law.").

Further, Plaintiffs also establish a claim for recovery of specific personal property, whether construed as akin to an action for replevin or otherwise.  Brown v. Stroud, No. CV 08-2348 VRW, 2011 WL 13312050, at *7 (N.D. Cal. Jan. 28, 2011) ("The essential elements of an action for recovery of specific personal property are (1) the plaintiff's right to possession of tangible property at the time of commencement of the action and (2) the defendant's actual and wrongful possession of the property . . . Defendant's argument that replevin is not a separate claim for relief is incorrect.  [R]eplevin is a common law remedy that permits the prevailing party to recover both personal property and incidental damages from an unlawful possessor.  In federal courts, replevin is a remedy specifically approved by rule, as governed by the appropriate state law . . . In California, the equivalent of the common law writ of replevin is an action for recovery of specific personal property. . . Therefore, the court rejects defendants' assertion that the Estate's claim is merely a remedy, and not a substantive claim.") (internal citations and quotation

1   entitled to it under a security agreement may be liable for conversion."  <u>Messerall v. Fulwider</u>,

2   199 Cal. App. 3d 1324, 1329, 245 Cal. Rptr. 548, 550 (Ct. App. 1988), <u>reh'g denied and opinion</u>

3   <u>modified</u> (Apr. 26, 1988); <u>In re Bailey</u>, 197 F.3d 997, 1000 (9th Cir. 1999) ("Under California

4   law, one who wrongfully withholds personal property from another who is entitled to it under a

5   security agreement may be liable for conversion."); <u>In re Thiara</u>, 285 B.R. 420, 428 (B.A.P. 9th

6   Cir. 2002) (same).  The California Commercial Code provides that after default, a secured party

7   may take possession of the collateral: "(1) Pursuant to judicial process[; or] (2) Without judicial

8   process, if it proceeds without breach of the peace."  Cal. Com. Code § 9609(a)-(b).  Further, the

9   Code provides that: "(a) After default, a secured party has the rights provided in this chapter and,

10  except as otherwise provided in Section 9602, those rights provided by agreement of the parties,"

11  and a secured party may: "(1) Reduce a claim to judgment, foreclose, or otherwise enforce the

12  claim, security interest, or agricultural lien by any available judicial procedure."  Cal. Com. Code

13  § 9601(a).

14

---

15  marks omitted); <u>Borges v. Farrar</u>, No. F040810, 2003 WL 22725357, at *6 (Cal. Ct. App. Nov. 20, 2003) ("Once a judgment is reached in an action for the recovery of personal property, one of several outcomes is possible

16  depending upon which party then has actual possession of the property.  If the plaintiff prevails, but does not have possession, he or she is entitled to specific recovery of the property, or if delivery is not possible, to its value plus damages for its taking and detention."); <u>Fuhu, Inc. v. Toys "R" US, Inc.</u>, No. 12CV2308-WQH-WVG, 2013 WL

17  12097569, at *15 (S.D. Cal. Mar. 1, 2013) ("We conclude that an action in conversion affords the proper remedy for the relief sought by the plaintiff.  If a party converts the personal property of another, it matters not by what means

18  the conversion is effected, the owner of the property may either proceed in conversion for damages for the wrongful act or in replevin to recover the specific property or damages if it cannot be restored.") (quoting <u>Shaw v. Palmer</u>, 65

19  Cal. App. 441, 449 (1924)); <u>Washington v. Neloms</u>, No. B294088, 2020 WL 614816, at *1 (Cal. Ct. App. Feb. 10, 2020) ("The operative complaint asserted claims for recovery of specific personal property (often referred to as

20  'claim and delivery'), and conversion."); <u>see also</u> <u>Borges</u>, 2003 WL 22725357, at *5 ("To add to the confusion, the underlying action incorporates to some degree the three common law forms of action available against a defendant

21  who has committed the tort of conversion of personal property: an action for specific recovery of the property when the original taking was unlawful ('replevin'); an action for specific recovery when the original taking was not

22  unlawful ('detinue'); and an action only for damages for the value of the property taken ('trover and conversion'). (5 Witkin, Cal. Procedure, supra, Pleading, § 651, pp. 107-109.)  However, a statutory action for the specific recovery

23  of personal property, whether in the nature of replevin or detinue, permits the recovery of the property's value if the property itself cannot be returned. (§ 667.)  Thus, the only significant difference between specific recovery and

24  conversion in such an action is the measure of damages, and the action itself is often termed simply one for conversion.") (unpublished); <u>Eleanor Licensing LLC v. Classic Recreations LLC</u>, 21 Cal. App. 5th 599, 612, 230

25  Cal. Rptr. 3d 511, 522 (Ct. App. 2018) ("As Classic emphasizes in its reply brief, Eleanor Licensing and Halicki did not plead or attempt to prove a cause of action for conversion.  However, they did plead, and the trial court ruled

26  they had proved, a cause of action for recovery of specific personal property, a code-based cause of action (see Code Civ. Proc., § 627), often incorrectly referred to as a 'claim and delivery action.' "); <u>Goldie v. Bauchet Properties</u>, 15

27  Cal. 3d 307, 320, 540 P.2d 1, 10 (1975); <u>Bmo Harris Bank N.A. v. Singh</u>, No. 116CV00482DADSAB, 2016 WL 5798841, at *7 (E.D. Cal. Oct. 4, 2016) ("An action for claim and delivery requires a plaintiff to show a right to

28  possession and the defendant's wrongful possession of the property at issue.").

Under California law, a security interest is enforceable against a debtor if: "(1) Value has been given[;] (2) [t]he debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party[;] . . . [and] (3) (A) The debtor has authenticated a security agreement that provides a description of the collateral."  Cal. Com. Code § 9203(b); Marshall Wealth Mgmt. Grp., Inc. v. Santillo, No. 18-CV-03510-LHK, 2019 WL 79036, at *7 (N.D. Cal. Jan. 2, 2019); United States v. Uptergrove, No. 1:10-CV-01598-RMW, 2012 WL 639482, at *5 (E.D. Cal. Feb. 24, 2012) ("Under California Commercial Code Section 9203(b)(3)(A), a security interest in personal property is created by a security agreement between a debtor and the secured party."); ERA Franchise Sys., Inc. v. Brager & Assocs., Inc., No. 1:06CV1861LJONEW, 2007 WL 2238161, at *7 (E.D. Cal. Aug. 2, 2007) ("California law provides that an enforceable security interest is created when (1) the debtor has signed a security agreement containing a description of the collateral . . . (2) value has been given, and (3) the debtor has rights in the collateral beyond mere possession"), report and recommendation adopted sub nom. ERA Franchise Sys., Inc. v. Brager & Assocs., No. 106CV1861LJONEW, 2007 WL 2409603 (E.D. Cal. Aug. 21, 2007).

California law has conformed its law with the Uniform Commercial Code ("UCC").  Cal. Comm. Code § 9101; Santillo, 2019 WL 79036, at *7.  Under the UCC, to sign a document is to authenticate it.  Santillo, 2019 WL 79036, at *7 (citing In re Wharton, 563 B.R. 289, 298 (B.A.P. 9th Cir. 2017)).

Plaintiffs have established the entering into the All Pure Security Agreement executed by All Pure as debtor, in favor of Plaintiffs.  (SAC ¶ 10, Ex. G, ECF No. 59-1 at 81-92; Robert Decl. ¶ 20, Ex. G, ECF No. 83-1 at 81-92.)  The All Pure Security Agreement describes collateral that secures all existing and future indebtedness of the Carters as Trustees and individually, the Zavalas, APPS, and/or All Pure as debtors to Plaintiffs as secured parties, including the Note, the Consulting Agreement, the All Pure Guaranty, and the APPS Guaranty.  (Id.)  The collateral is described as "the following property, whether now owned or owing to, or hereafter acquired by or arising in favor of, Debtor, including under any trade names, styles, or derivations of Debtor, and whether owned by or consigned by or to, or leased from or to, Debtor,

and regardless of where located": (1) all accounts; (2) all chattel paper; (3) all contracts; (4) all equipment; (5) all general intangibles; (6) all goods); (7) all instruments and letters of credit; (8) all intellectual property; (9) all inventory; (10) all investment property; (11) all deposit accounts; (12) all money, cash, or cash equivalents; and (13) "[t]o the extent not otherwise included, all proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of each of the foregoing."  (ECF No. 59-1 at 85-86.)  The signatories are Plaintiffs Robert and Sandra as the secured parties, and All Pure as debtor, signed by Jack Carter as President on behalf of All Pure.  (ECF No. 59-1 at 92.)

Plaintiffs have established the entering into the APPS Security Agreement executed by APPS as debtor, in favor of Plaintiffs.  (SAC ¶ 10, Ex. H, ECF No. 59-1 at 93-104; Robert Decl. ¶ 21, Ex. H, ECF No. 83-1 at 93-104.)  The APPS Security Agreement describes collateral that secures all existing and future indebtedness of the Carters as Trustees and individually, the Zavalas, APPS, and/or All Pure as debtors to Plaintiffs as secured parties, including the Note, the Consulting Agreement, the All Pure Guaranty, and the APPS Guaranty.  (Id.)  The collateral is described as "the following property, whether now owned or owing to, or hereafter acquired by or arising in favor of, Debtor, including under any trade names, styles, or derivations of Debtor, and whether owned by or consigned by or to, or leased from or to, Debtor, and regardless of where located": (1) all accounts; (2) all chattel paper; (3) all contracts; (4) all equipment; (5) all general intangibles; (6) all goods); (7) all instruments and letters of credit; (8) all intellectual property; (9) all inventory; (10) all investment property; (11) all deposit accounts; (12) all money, cash, or cash equivalents; and (13) "[t]o the extent not otherwise included, all proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of each of the foregoing."  (ECF No. 59-1 at 97-98.)  The signatories are Plaintiffs Robert and Sandra as the secured parties, and APPS as debtor, signed by Jack Carter as President on behalf of APPS.  (Id. at 104.)

Plaintiffs have established the entering into the Carter and Zavala Security Agreement executed by the Carters and the Zavalas as debtors, in favor of Plaintiffs.  (SAC ¶ 10, Ex. I, ECF No. 59-1 at 105-110; Robert Decl. ¶ 22, Ex. I, ECF No. 83-1 at 105-110).  The Carter and Zavala

Security Agreement describes collateral that secures all existing and future indebtedness of the Carters as Trustees and individually, the Zavalas, APPS, and/or All Pure as debtors to Plaintiffs as secured parties, including the Note, the Consulting Agreement, the All Pure Guaranty, and the APPS Guaranty.  (Id.)  The collateral is described as (1) one thousand (1,000) shares of the common stock of APPS, represented by share certificate(s) no. 11 registered in the name of the Carter Family Trust and all stock distributions of such; (2) four hundred and ninety (490) shares of the common stock of All Pure, share certificate no. 4 registered in the name of Phil Zavala and Julie Zavala, and all stock distributions of such stock; and (3) five hundred and ten (510) shares of the common stock of All Pure, share certificate no. 3 registered in the name of Jack Carter and Susie Carter as Trustees of the Carter Family Trust, and all stock distributions of such stock. (ECF No. 59-1 at 106.)  The signatories are Plaintiffs Robert and Sandra as the secured parties, the Carters as Trustees and individually, and the Zavalas, as debtors.  (ECF No. 59-1 at 110.)

The three security agreements each provide that the failure of Defendants to pay any amounts owed under the underlying agreements constitutes a breach of the respective security agreements, and further provide that upon default, Plaintiffs may take possession of the secured collateral and that Defendants shall allow Plaintiffs to enter their business locations to take possession of all collateral identified, giving notice of public or private sale, and may exercise all rights and remedies available to a secured creditor, including but not limited to the rights and remedies available under the California Commercial Code.  (ECF No. 59-1 at 89-90, 101-102, 108-109.)

The Court finds the APPS Security Agreement, the All Pure Security Agreement, and the Carter and Zavala Security Agreement, meet the three requirements under California law for enforceability of a security agreement described above.  First, value has been given through securing payment of the obligations contained in the agreements.  Cal. Com. Code § 9203(b)(1). Second, the debtors had the rights in the collateral or the power to transfer rights in the collateral to the secured parties.  Cal. Com. Code § 9203(b)(2).  Third, the Court finds Plaintiffs have established that the debtors have "authenticated a security agreement that provides a description of the collateral."  Cal. Com. Code § 9203(b)(3)(A); Santillo, 2019 WL 79036, at *7 (to sign a

document is to authenticate it under the UCC); Century 21 Real Estate, LLC. v. Heritage Real Estate, Inc., No. C06 7809 WDB, 2007 WL 2023552, at *12 (N.D. Cal. July 6, 2007) (noting a security agreement's description of the collateral "should include some designation of the property conveyed and of the place where it may be found . . . [h]owever the description need not be specific [and ] [a]ll that is required is that the agreement reasonably identif[y] what is described . . . [and] California courts indicate that the description may be less precise when only the rights of the parties to the security agreement are at issue.") (internal citations and quotation marks omitted).

The All Pure Security Agreement identifies the location of the collateral as 3237 E. Malaga, Fresno, California 93725, and the APPS Security Agreement identifies the location of the collateral as 9100 Independence Ave., Chatsworth, California 91311.  (ECF No. 59-1 at 88, 100.)  While the Carter and Zavala Security Agreement does not identify the location of the stock certificates, it identifies an address to serve notice on the debtor parties: P.O. Box 1282, Simi Valley, California 93062.   (ECF No. 59-1 at 110.)   Further, in Plaintiff Robert's declaration, the presumptive location of the collateral is identified as 3237 E. Malaga, Fresno, California 93725, or another location only known to Defendants.  (Robert Decl. ¶ 46.)  Plaintiff declares a belief that none of the collateral is being held by Defendants for any tax purpose, and believes the current market value is less than $500,000.00.  (Robert Decl. ¶¶ 47-48.)

The Court thus finds the security agreements to be enforceable and that Plaintiffs have established a right to foreclose on the security interests.  See Santillo, 2019 WL 79036, at *7 ("In the instant case, value was given by Plaintiffs in exchange for a security interest in transacted assets as set forth in the Agreement, the debtor is in possession and has rights in the collateral, and the debtor has signed a security agreement that provides a description of the collateral . . . This is sufficient to state a claim for foreclosure of a security interest.").  As noted above, "One who wrongfully withholds personal property from another who is entitled to it under a security agreement may be liable for conversion."  Messerall, 199 Cal. App. 3d at 1329; In re Bailey, 197 F.3d at 1000.  Plaintiffs have sufficiently established breach of the agreements underlying the Security Agreements, specifically the Note, the Consulting Agreement, the All Pure Guaranty,

1   and the APPS Guaranty.  See supra Section I(B); Section III(C)(2)(a)-(b).  Through the breach of

2   the agreements described in the security agreements Plaintiffs have established the elements for

3   conversion, or for recovery of specific personal property, however the claim is construed, as

4   described above.  See footnote 21, supra; Judicial Council of California Civil Jury Instruction

5   2100; see also Ox Labs, Inc. v. Bitpay, Inc., No. CV 18-5934-MWF (KSX), 2020 WL 1039012,

6   at *7 (C.D. Cal. Jan. 24, 2020) ("Available remedies for conversion include specific recovery of

7   property with damages for its detention and damages based on the value of the property.")

8   (quoting Flores v. Dep't of Corr. & Rehab., 224 Cal. App. 4th 199, 206, 168 Cal. Rptr. 3d 204,

9   209 (2014)).  Also as noted above, the Commercial Code provides that after default, a secured

10  party may take possession of the collateral: "(1) Pursuant to judicial process[; or] (2) Without

11  judicial process, if it proceeds without breach of the peace."  Cal. Com. Code § 9609(a)-(b).

12  Further, the Code provides that after a default, a secured party may: "(1) Reduce a claim to

13  judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any

14  available judicial procedure."  Cal. Com. Code § 9601(a); see also Century 21 Real Estate, LLC.

15  v. Heritage Real Estate, Inc., No. C06 7809 WDB, 2007 WL 2023552, at *12–13 (N.D. Cal. July

16  6, 2007) (recommending entering judgment under security agreements pursuant to California

17  Commercial Code § 9601).

18          Accordingly, for all of the above reasons, the Court recommends the district judge enter a

19  judgment for Plaintiffs and against Defendants on Plaintiffs sixth, seventh, and eighth causes of

20  action that permits Plaintiffs to take possession of the collateral secured by the All Pure Security

21  Agreement, the APPS Security Agreement, and the Carter and Zavala Security Agreement.

22          **d.    Plaintiffs' Cause of Action for Rights to Stock Shares and Remedies**

23          Plaintiffs' ninth cause of action is against the Carters, as Trustees and individually, and

24  the Zavalas, for a declaratory judgment regarding their rights to the stock shares identified as

25  collateral in the Carter and Zavala Security Agreement.  (SAC ¶¶ 84-90.)

26          Under California law, a complaint for declaratory relief must demonstrate: (1) a proper

27  subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating

28  to the rights or obligations of a party.  Northfield Ins. Co. v. Garcia, No. 115CV01701DADSKO,

2016 WL 2625934, at *5 (E.D. Cal. May 9, 2016) (citing <u>Brownfield v. Daniel Freeman Marina Hosp.</u>, 208 Cal. App. 3d 405, 410 (1989)), <u>report and recommendation adopted,</u> No. 115CV01701DADSKO, 2016 WL 8650137 (E.D. Cal. July 22, 2016).  Proper subject matter for declaratory relief is described in the California Code of Civil Procedure:

> Any person interested under a written instrument, excluding a will or a trust, or under a contract, or who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property, or with respect to the location of the natural channel of a watercourse, may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract. He or she may ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time. The declaration may be either affirmative or negative in form and effect, and the declaration shall have the force of a final judgment. The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought.

Cal. Civ. Proc. Code § 1060; <u>see also</u> <u>Osseous Techs. of Am., Inc. v. DiscoveryOrtho Partners LLC</u>, 191 Cal. App. 4th 357, 364–65, 119 Cal. Rptr. 3d 346, 351–52 (2010) ("Declaratory relief pursuant to this section has frequently been used as a means of settling controversies between parties to a contract regarding the nature of their contractual rights and obligations.") (citations omitted).

Plaintiffs' description of this claim and requested relief appears to differ between the complaint and the application for default judgment and associated materials.  First, in the second amended complaint, the heading for the ninth claim for relief is only brought against the Carters (Trustees and individually), and the Zavalas, for "Rights to Stock Shares and Remedies."  (SAC ¶¶ 84-90.)  Thereafter, that section of the complaint describes the Carter and Zavala Security Agreement and the collateral secured by such agreement, namely the stock certificates, and Plaintiffs' right to such.  (<u>Id.</u>)  This section does not refer to either the APPS Security Agreement nor the All Pure Security Agreement, nor does it refer to the collateral secured by those agreements.  (<u>Id.</u>)  In the relief portion of the complaint, Plaintiffs state they seek a declaration that: (1) Defendants have breached their respective contracts and obligations, including the Agreement, Note, Consulting Agreement, All Pure Guaranty, APPS Guaranty, All Pure Security

Agreement, APPS Security Agreement, and the Carter and Zavala Security Agreement; and (2) Plaintiffs are entitled to exercise their rights and remedies over the Carter and Zavala Collateral, including, but not limited to, transferring and registering the Carter and Zavala Collateral in their names, or any part of it, and exercise all rights, options, and privileges with respect to the Carter and Zavala Collateral as set forth in the Carter and Zavala Security Agreement.  (SAC at 22.)

The application for default judgment and supporting materials expand out on the requested declaratory relief and request the relief to encompass the collateral under the APPS Security Agreement and All Pure Security Agreement, and request relief stating: "Judgment in favor of Plaintiffs Robert and Sandra Christofferson against Defendants Jack & Su[s]ie Carter (individually and in their capacity as trustees), Phil & Julie Zavala, All Pure, and APPS determining that Defendants have breached their respective contracts, agreements, and obligations with Plaintiffs including the Agreement, Note, Consulting Agreement, All Pure Guaranty, APPS Guaranty, All Pure Security Agreement, Apps Security Agreement, and the Carter and Zavala Security Agreement and thus, Plaintiffs are entitled to exercise their rights and remedies of the All Pure, APPS, Carter, and Zavala collateral, including but not lim[i]ted to, transferring and registering the Carter and Zavala shares in All Pure and APPS into their names, or any part of it, and to exercise all rights, options, and privileges thereto."  (ECF Nos. 81 at 5, 84 at 35; 90 at 5.)  In the memorandum in support of the application, Plaintiff states they "are entitled to a binding determination of their rights to certain property, including, but not limited to, possession of the stock shares, and the right to exercise their rights and remedies set out in Paragraph 9 of the Carter and Zavala Security Agreement and any other collateral or remedy consistent with the aforementioned causes of action of the SAC and set out elsewhere in this memorandum."  (Mem. 21.)

At the hearing on the motion for default judgment, the Court noted that the declaratory relief requested in Plaintiffs' motion appeared somewhat more expansive than contained in the ninth cause of action within the second amended complaint.  Plaintiffs' counsel indicated that given the fact that the sixth and seventh claims for relief already provide the needed relief under the APPS Security Agreement and All Pure Security Agreement, declaratory relief would largely

1  be duplicative and thus essentially unnecessary, and thus Plaintiffs were not objectionable to the

2  Court's use of the more narrow declaratory relief as requested in the operative pleading.

3       Accordingly, the Court recommends granting default judgment on Plaintiffs' ninth cause

4  of action and entering a declaratory judgment as follows: (1) Defendants have breached their

5  respective contracts and obligations, including the Agreement, Note, Consulting Agreement, All

6  Pure Guaranty, APPS Guaranty, All Pure Security Agreement, APPS Security Agreement, and

7  the Carter and Zavala Security Agreement; and (2) Plaintiffs are entitled to exercise their rights

8  and remedies over the Carter and Zavala Collateral, including, but not limited to, transferring and

9  registering the Carter and Zavala Collateral in their names, or any part of it, and exercise all

10  rights, options, and privileges with respect to the Carter and Zavala Collateral as set forth in the

11  Carter and Zavala Security Agreement.  (SAC at 22.)

12       3.    The Sum of Money at Stake in the Action

13       Default judgment is disfavored where large amounts of money are involved or the award

14  would be unreasonable in light of the defendant's actions.  G & G Closed Circuit Events, LLC v.

15  Nguyen, No. 3:11-cv-06340-JW, 2012 WL 2339699, at *2 (N.D. Cal. May 30, 2012).  In this

16  action, Plaintiffs are seeking damages in excess of one million dollars in addition to attorneys'

17  fees.  Plaintiffs are also seeking possession of property offered as collateral backing the

18  agreements.  While the amount is substantial, the amounts in question are not prospective or

19  subjective as in a medical malpractice or personal injury case where various factors and disputes

20  may impact the amounts, but are rather fully established and objective amounts of money that

21  were agreed to by the parties through the entering of various signed agreements that were

22  performed on in part through ongoing payments before the breaches occurred.

23       Thus, while the amount is substantial, it is not unreasonable in light of the allegations

24  contained in the complaint and supporting documentation.  Defendants have failed to appear and

25  dispute the amounts requested in damages.  Accordingly, the Court finds this factor is neutral or

26  weighs in favor of granting default judgment.

27       4.    The Possibility of a Dispute Concerning Material Facts

28       There is little possibility of dispute regarding the material facts due to the factual

1    allegations in the complaint being taken as true upon Defendant's default. Defendants were

2    properly served, have failed to appear, and therefore have admitted all material facts alleged in

3    Plaintiff's complaint. See Garamendi, 683 F.3d at 1080; PepsiCo, 238 F. Supp. at 1177 ("Upon

4    entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to

5    damages."). Thus, there is no dispute regarding the material facts due to the factual allegations

6    in the complaint being taken as true upon Defendants' default.

7       Accordingly, this factor weighs in favor of granting default judgment in favor of

8    Plaintiffs.

9       5.     Whether the Default Was Due to Excusable Neglect

10       Defendants have been served with the operative complaint and failed to file a responsive

11    pleading. (ECF Nos. 64-71.) Although served with the application for entry of default and

12    application for default judgment (ECF Nos. 72, 87, 92), Defendants did not subsequently make

13    an appearance or filing in this action, nor file an objection or opposition to the motion for default

14    judgment. Given these facts, there is no indication or evidence that the failure to respond was

15    due to excusable neglect. See Shanghai Automation Instrument Co. v. Kuei, 194 F. Supp. 2d

16    995, 1005 (N.D. Cal. 2001) ("The default of defendant . . . cannot be attributed to excusable

17    neglect. All were properly served with the Complaint, the notice of entry of default, as well as

18    the papers in support of the instant motion.").

19       Accordingly, the Court finds this Eitel factor weighs in favor of granting default

20    judgment in favor of Plaintiffs.

21       6.     The Strong Policy Underlying the Federal Rules of Civil Procedure Favoring
                Decisions on the Merits
22

23       Default judgments are disfavored because "[c]ases should be decided on their merits

24    whenever reasonably possible." Eitel, 782 F.2d at 1472. However, the policy favoring decisions

25    on the merits does not weigh against entering default judgment whereas here the Defendants'

26    failure to appear has made a decision on the merits impossible at this juncture. Given the

27    prejudice to Plaintiff if default judgment is not granted as discussed above, and the merits of the

28    allegations contained in the complaint, granting default judgment in this case would not violate

the general policy under the Federal Rules of Civil Procedure favoring decisions on the merits. See PepsiCo, 238 F. Supp. 2d at 1177 ("Defendant's failure to answer Plaintiffs' Complaint makes a decision on the merits impractical, if not impossible. Under Fed. R. Civ. P. 55(a), termination of a case before hearing the merits is allowed whenever a defendant fails to defend an action.").

Accordingly, the Court finds the policy favoring decisions on the merit does not preclude entering default judgment against Defendants under these circumstances.

### 7.   The Eitel Factors Weigh in Favor of Granting Default Judgment

Based on the foregoing, the Court finds that the Eitel factors weigh in favor of granting default judgment on all of Plaintiffs' causes of action, and recommends that Plaintiff's motion for default judgment be granted.

### D.   Relief Requested

Plaintiffs seek principal damages due under the agreements, recovery of personal property pursuant to the security agreements, interest, attorneys' fees, and the costs of bringing suit in this matter.

### 1.   Principal Damages and Interest

Under the Agreement, Plaintiffs allege Defendants (Carters only as Trustees), failed to pay the market value of $998.62 for bottles of pool chemicals, and failed to reimburse Plaintiffs for $14,733.45 improperly withdrawn from All Pure business checking account. (Mem. 10-11; Robert Decl. ¶¶ 27-31; SAC ¶¶ 15-16.)

Due to the continuing failure to make monthly payments beginning in October of 2017 and continuing thereafter, Plaintiffs allege the breach of the Note accelerated the full balance due in the sum of $798,375.52, as of June 1, 2018, plus late fees in the amount of $450.00. (Mem. 11, 16; Robert Decl. ¶¶ 34-37, Ex. N; SAC ¶¶ 35-36.)

Plaintiffs allege All Pure failed to make monthly payments due on the Consulting Agreement beginning in October 1, 2017, and now the total amount owed for breach of the Consulting Agreement is $240,000.00, plus late fees in the amount of $450.00. (Mem. 12; Robert Decl. ¶¶ 41-44; SAC ¶¶ 21, 43.)

1    Defendants made two separate payments of $100,000.00 since the drafting of the second

2    amended complaint, the first on September 10, 2019, and the second on September 25, 2019.

3    (Mem. 13; Robert Decl. ¶ 54.)   The application of these payments to the amounts owed in

4    interest and principal is delineated in counsel's declaration.  (Mem. 13; Horowitt Decl. ¶¶ 33-

5    45.)  Immediately prior to the hearing on this motion, on June 9, 2020, Plaintiffs notified the

6    Court that two additional payments of $3,000.00 each were made following the filing of the

7    motion for default judgment.  (ECF No. 93.)  The payments are dated May 29, 2020 and June 1,

8    2020.  Due to accounting discrepancies identified by the Court and highlighted at the June 10,

9    2020 hearing, on June 11, 2020, Plaintiffs' counsel filed a supplemental declaration correcting

10   such discrepancies and recalculating damages for the Court to use in confirming the calculated

11   damages.  (Post-Hearing Declaration of Keith M. White ("White Decl."), ECF No. 95.)   The

12   declaration further updates the calculations by incorporating and applying the two recent

13   payments of $3,000.00 each.  (Id.)

14       Counsel Horowitt declares that on the Note, simple interest was calculated at the rate of

15   8.5% using the amortization program Value.  (Horowitt Decl. ¶ 33, Ex. 6.)

16       **a.    Principal and Interest Prior to September 10, 2019**

17       Plaintiffs proffer that prior to the two September 2019 payments, Defendants owed the

18   following amounts in principal damages: (1) $15,732.07 on the Agreement since March 1, 2012;

19   (2) $798,375.52 on the Note since June 1, 2018, with accrued interest of $15,241.28 as of June 1,

20   2018, the date of the last payment; (3) $240,000 as of January 4, 2018 on the Consulting

21   Agreement.  (Robert Decl. ¶ 56, Ex. N; Horowitt Decl. ¶ 33-35, Ex. 6; White Decl. ¶ 35.)[22]

22       Plaintiffs proffer that from March 1, 2012 to September 10, 2019, interest accrued for

23

[22]  It appears that Plaintiffs omitted adding the $450.00 in late fees that is described as being added to the principal balance in the memorandum.  (Mem. 16.)  Therein, Plaintiffs state that the total principal balance on the Note prior to the September 2019 payments was $798,825.52, including the $450.00 in fees.  (Id.)  Although $450.00 in late fees is also referenced in one portion of the memorandum as being applicable to the balance owing on the Consulting Agreement (Mem. 12), another portion does not (Mem. 16).  Thus, it appears counsel's workup here omits any addition of late fees to the principal balances on the Note and Consulting Agreement prior to proceeding to compute interest.  At the June 10, 2020 hearing, counsel acknowledged these fees were in fact omitted, and Plaintiffs accept such omission and do not request a recalculation with such fees included, and thus these calculations do not include such late fees.  (ECF No. 94.)

2,749 days under the Agreement's balance of $15,732.07 at 10% per annum at a daily rate of $4.31 for a total of $11,848.19, waiving interest between January 4, 2012 through March 1, 2012. (White Decl. ¶ 36.)[23]

Plaintiffs proffer that from June 1, 2018 through September 10, 2019, interest accrued for 466 days on the Note's balance of $798,375.52 at a daily rate of $185.92 for a total of $86,638.72, which combined with the accrued interest, the total interest owed on the Note on September 10, 2019, was $101,880.00. (White Decl. ¶ 37.)[24]

Plaintiffs proffer that from January 4, 2018, to September 10, 2019, interest accrued for 614 days on the principal amount of $240,000.00 at 10% per annum at a daily rate of $65.75 for a total of $40,370.50. (White Decl. ¶ 38, as correcting Horowitt Decl. ¶ 38.)[25]

### b. Application of September 10, 2019 Payment and Interest Prior to September 25, 2019

Plaintiffs proffer that by applying the September 10, 2019 payment of $100,000.00 to interest first, the payment eliminated the accrued interest on the Agreement, and all but $13,728.19, of the interest on the Note. (White Decl. ¶ 39, as correcting Horowitt Decl. ¶ 39.)[26]

After the September 10, 2019 payment and prior to September 25, 2019 payment, additional interest accrued. Plaintiffs proffer that from September 10, 2019, to September 25, 2019, interest accrued for 15 days under the Agreement's balance of $15,732.07 at 10% per annum at a daily rate of $4.31 for a total of $64.65. (Horowitt Decl. ¶ 41; White Decl. ¶ 41.)[27]

---

[23] Plaintiffs' original filings made a typo stating the period ended in the year 2020, rather than 2019. (Mem. 25; Horowitt Decl. ¶ 36.) Further, even using the year 2019, the Court found the Plaintiff's calculation using a span of 2,707 days to be incorrect, and notified Plaintiff of this fact at the June 10, 2020 hearing. Counsel White's declaration now uses the correct time span of 2,749 days. (White Decl. ¶ 36.) The calculation appears correct: $(15,732.07 \times 0.1 \div 365 = 4.31)$ $(4.31 \times 2,749 = 11,848.19)$.

[24] Plaintiffs' original filings utilized a time span of 455 days in the calculation, and finding such time span to be incorrect, notified Plaintiff of this fact at the June 10, 2020 hearing. Counsel White's declaration now uses the correct time span of 466 days. (White Decl. ¶ 37.) The calculation appears correct: $(\$798,375.52 \times 0.085 \div 365 = \$185.92)$ $(\$185.92 \times 466 = \$86,638.72)$ $(\$15,241.28 + \$86,638.72 = \$101,880.00)$.

.

[25] The calculation appears correct: $(\$240,000.00 \times 0.10 \div 365 = \$65.75)$ $(\$65.75 \times 614 = \$40,370.50)$.

[26] This calculation appears correct: $(\$100,000.00 - \$11,848.19 = \$88,151.81)$ $(\$101,880.00 - \$88,151.81 = \$13,728.19)$.

[27] This calculation appears correct: $(\$4.31 \times 15 = \$64.65)$.

1    Plaintiffs proffer that from September 10, 2019, to September 25, 2019, interest accrued

2  for 15 days on the Note's balance of $798,375.52 at a daily rate of $185.92 for a total of

3  $2,788.80, which when combined with the accrued interest of $13,728.19, makes the total

4  interest owed on the Note on September 25, 2019, $16,516.99.  (White Decl. ¶ 42, as correcting

5  Horowitt Decl. ¶ 42.) [28]

6    Plaintiffs proffer that from September 10, 2019, to September 25, 2019, interest accrued

7  for 15 days on the Consulting Agreement's principal amount of $240,000.00 at 10% per annum

8  at a daily rate of $65.75 for a total of $986.25, which when combined with the previously

9  accrued interest, totals $41,356.75.  (White Decl. ¶ 43; Horowitt Decl. ¶ 43.) [29]

10    **c.    September 25, 2019 Payment and Interest Thereafter**

11    Plaintiffs proffer that after applying the September 25, 2019 payment of $100,000.00 to

12  interest first, the payment eliminates the accrued interest on the Agreement, the Note, and the

13  Consulting Agreement, with $42,061.61 remaining.  (White Decl. ¶ 44, as correcting Horowitt

14  Decl. ¶ 44.) [30]

15    Thereafter, the remaining amount of the payment was applied to each contract by a

16  percentage calculated by the original amount owed for each contract at the time of the breach,

17  divided by the total amount owed at the time of the breach, and thus: (1) 1.5211% or $639.80

18  was applied to the balance of the Agreement; (2) 77.1950% or $32,469.46 was applied to the

19  Note; and 21.2839% or $8,952.35 was applied to the Consulting Agreement.  (White Decl. ¶ 45,

20  as correcting Horowitt Decl. 45.)[31]  Therefore, as of September 25, 2019, there remained due and

21

---

[28]  This calculation appears correct: ($185.92  ×  15 = $ 2,788.80) ($2,788.80  +  $13,728.19 = $16,516.99).

[29]  This calculation appears correct:  ($40,370.50  +  $986.25 = $41,356.75).

[30]  This calculation appears correct:  ($100,000.00  -  $64.65  -  $16,516.99  -  $41,356.75 = $42,061.61).

[31]  It is unclear precisely how counsel calculated these percentages.  For example, taking the amounts discussed above owing at the time of the breach, excluding the $450.00 late fees counsel states was omitted, yields the following similar, but not identical percentages: ($15,732.07  +  $798,375.52  +  $240,000.00 = $1,054,107.59, the total amount of the three contracts); ($15,732.07  ÷  $1,054,107.59 = 0.0149, or 1.49% on the Agreement); ($798,375.52  ÷  1,054,107.59 = 0.7573, or 75.73% on the Note); and ($240,000.00  ÷  $1,054,107.59 = 0.2276, or 22.76% on the Consulting Agreement).  Nonetheless, the Court recommends accepting the allocation as proffered, given any differences, which may or may not be errors, are minimal given the total sum of the remaining payment was in fact applied to these three agreements' balances, and these percentages only varied slightly the precise allocation between the agreements.

1 owing: (1) $15,092.27 on the Agreement; (2) $765,906.06 on the Note; and (3) $231,047.65 on

2 the Consulting Agreement.  (White Decl. ¶ 45, as correcting Horowitt Decl. ¶ 45; Mem. 17-18.)[32]

3      Plaintiffs proffer that from September 25, 2019, interest accrues on the Agreement's

4 principal balance of $15,092.27 at 10% per annum at the daily rate of $4.1349.[33]  (White Decl. ¶

5 46, correcting Horowitt Decl. ¶ 46.)  Plaintiffs proffer that from September 25, 2019, interest

6 accrues on the Note's principal balance of $765,906.06 at 8.5% per annum at the daily rate of

7 $178.3617.[34]  (White Decl. ¶ 47, correcting Horowitt Decl. ¶ 47.)  Plaintiffs proffer that from

8 September 25, 2019, interest accrues on the Consulting Agreement's principal balance of

9 $231,047.65 at 10% per annum at the daily rate of $63.3007.[35]  (White Decl. ¶ 48, correcting

10 Horowitt Decl. ¶ 48.)

11      **d.**     **Application of the May 29, 2020, and June 1, 2020 Payments**

12      In the original declaration submitted notifying the Court of the May 29, 2020, and June 1,

13 2020 payments of $3,000.00 each, Plaintiffs first requested the payments be applied to attorneys'

14 fees first, and then interest.  (ECF No. 93 at 3.)  At the hearing, counsel explained the most

15 straightforward and practical application of the payments would be to apply to the accrued

16 interest on the Consulting Agreement, and the post-hearing declaration requests the payments be

17 applied to the accrued interest on the Consulting Agreement.  (White Decl. ¶ 48.1)[36]

18      Plaintiffs proffer that from September 25, 2019, and May 29, 2020, interest accrued for

19 247 days at the daily rate of $63.3007, and thus the Consulting Agreement accrued interest of

20

---

21 [32]  This calculation appears correct using the above numbers: (1) Agreement (0.015211 × $42,061.61 = $639.7991) ($15,732.07 - $639.7991 = $15,092.2709); (2) Note (0.77195 × $42,061.61 = $32,469.459)

22 ($798,375.52 - $32,469.459 = $765,906.061); (3) Consulting Agreement (0.212839 × $42,061.61 = $8,952.351) ($240,000.00 - $8,952.351 = $231,047.649).

23 [33]  This calculation appears correct: ($15,092.27 × 0.10 ÷ 365 = $4.134868).

24 [34]  This calculation appears correct: ($765,906.06 × 0.085 ÷ 365 = $178.36168).
[35]  This calculation appears correct: ($231,047.65 × 0.10 ÷ 365 = $63.3007).

25 [36]  The Court notes that only All Pure was a party to the Consulting Agreement.  While one declaration avers that

26 Defendant Phil Zavala made the contact regarding the most recent payments, the declarations do not indicate that Defendants requested the payments to be applied in any particular manner.  (ECF Nos. 93; White Decl. ¶ 48.1.)

27 Nonetheless, given the overlapping nature of the parties across the various agreements and guaranties, this does not appear facially improper, and the Court recommends accepting Plaintiffs' request to apply the payments to the

28 accrued interest on the Consulting Agreement.

$15,635.27 through May 29, 2020.[37]   (White Decl. ¶ 48.1)  Plaintiffs proffer that after applying the two $3,000 payments, there remains $9,635.27 of accrued interest on May 29, 2020, and the principal amount and the daily interest rate remains unchanged.[38]   (White Decl. ¶ 48.1)

  **e.**  **Remaining Principal and Further Interest Calculations**

  Based on all of the above calculations Plaintiff's proffer the Agreement's remaining principal is $15,092.27 and accrues daily interest of $4.1349 from September 25, 2019.  (White Decl. ¶ 48.2)  Plaintiffs proffer the Note's remaining principal is $765,906.06 and accrues daily interest of $178.3617 from September 25, 2019.  (White Decl. 48.3)  Plaintiffs proffer that the Consulting Agreement's remaining principal is $231,047.65, with accrued interest unpaid in the amount of $9,635.27, in addition to daily interest of $63.3007 accruing from May 29, 2020.  (White Decl. ¶ 48.4.)

  The Court finds these amounts due to be fair and accurate.  Accordingly, the Court recommends entering default judgment and awarding principal damages and interest in these amounts, with such further interest accruing on the Agreement and Note since September 25, 2019, and on the Consulting Agreement since May 29, 2020.

  2. <u>Recovery of Property Under the Security Agreements</u>

  Above, <u>infra</u> Sections I(B) and III(C)(2)(c), the Court summarized the property described as collateral within the All Pure Security Agreement, the APPS Security Agreement, and the Carter and Zavala Security Agreement, and found that Plaintiffs were entitled to default judgment on the claims relating to these security agreements, and entitled to recover such property.  The Court incorporates Sections I(B) and III(C)(2)(c) here by way of reference.  Based on these facts and the discussion incorporated herein, the Court recommends entering judgment allowing Plaintiffs to recover the collateral described in the All Pure Security Agreement, APPS Security Agreement, and the Carter and Zavala Security Agreement.

///

---

[37]  This calculation appears correct:  (247  ×  $63.3007 = $15,635.27).  The Court notes that while one payment was received after May 29, 2020, Plaintiffs have utilized this earlier date in applying the payment, a slight concession that favors Defendants.

[38]  This calculation appears correct:  ($15,635.27  -  $6,000.00 = $9,635.27).

3.      Attorneys' Fees

Plaintiffs are requesting attorneys' fees in the amount of $82,368.00 pursuant to California Civil Code Section 1717.  (Mem. 22-25; Horowitt Decl. ¶ 55.)

"In an action involving state law claims, we apply the law of the forum state to determine whether a party is entitled to attorneys' fees, unless it conflicts with a valid federal statute or procedural rule."  MRO Comm'ns, Inc. v. Am. Tel. & Tel. Co., 197 F.3d 1276, 1282 (9th Cir. 1999).  California Civil Code Section 1717 allows for the recovery of reasonable attorneys' fees by the prevailing party in an action involving a contract, when the contract contains an attorneys' fees provision.  Section 1717 provides in relevant part:

> (a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs . . .

> . . . Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit . . .

> . . . (b)(1) The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. The court may also determine that there is no party prevailing on the contract for purposes of this section.

Cal. Civ. Code § 1717.  "Although Section 1717 limits the court's ability to enforce an attorney fees clause to 'any action on the contract,' California courts liberally construe 'on a contract' to extend to any action '[a]s long as an action 'involves' a contract and one of the parties would be entitled to recover attorney fees under the contract if that party prevails in its lawsuit.' "  In re Baroff, 105 F.3d 439, 442–43 (9th Cir. 1997) (quoting Milman v. Shukhat, 22 Cal.App.4th 538, 27 Cal.Rptr.2d 526, 529–30 (1994)).

In awarding fees under Civil Code Section 1717, "the fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate."  PLCM Grp. v. Drexler, 22 Cal.4th 1084, 1095, 997 P.2d 511, 518 (2000), as modified (June 2, 2000).  The Court has "broad authority to determine the amount of a reasonable fee."  Id.  The Ninth Circuit has explained the lodestar approach as follows:

The lodestar/multiplier approach has two parts.  First a court determines the lodestar amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.  The party seeking an award of fees must submit evidence supporting the hours worked and the rates claimed.  A district court should exclude from the lodestar amount hours that are not reasonably expended because they are excessive, redundant, or otherwise unnecessary.  Second, a court may adjust the lodestar upward or downward using a multiplier based on factors not subsumed in the initial calculation of the lodestar.  The lodestar amount is presumptively the reasonable fee amount, and thus a multiplier may be used to adjust the lodestar amount upward or downward only in rare and exceptional cases, supported by both specific evidence on the record and detailed findings by the lower courts that the lodestar amount is unreasonably low or unreasonably high.

Van Gerwin v. Guarantee Mut. Life Co., 214 F.3d 1041,1045 (9th Cir. 2000) (internal citations, footnote, and quotation marks omitted).

Thus, under the lodestar method, the Court will first determine the appropriate hourly rate for the work performed, and that amount is then multiplied by the number of hours properly expended in performing the work.  Antoninetti v. Chipotle Mexican Grill, Inc., 643 F.3d 1165, 1176 (9th Cir. 2010); McElwaine v. US W., Inc., 176 F.3d 1167, 1173 (9th Cir. 1999).  The lodestar amount is to be determined based upon the prevailing market rate in the relevant community.  Blum v. Stenson, 465 U.S. 886, 896 (1984); Drexler, 22 Cal.4th at 1095 ("The reasonable hourly rate is that prevailing in the community for similar work.") (citations omitted).  "In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended."  Chalmers v. City of Los Angeles, 796 F.2d 1205, 1210 (9th Cir. 1986) (citations omitted).  "Those hours may be reduced by the court where documentation of the hours is inadequate; if the case was overstaffed and hours are duplicated; if the hours expended are deemed excessive or otherwise unnecessary."  Id.

"While in most cases the lodestar figure is presumptively reasonable, 'in rare cases, a district court may make upward or downward adjustments to the presumptively reasonable lodestar on the basis of those factors set out in [Kerr v. Screen Extras Guild], that have not been subsumed in the lodestar calculation.' "  Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 982 (9th Cir. 2008) (quoting Gates v. Deukmejian, 987 F.2d 1392, 1402 (9th Cir. 1992)).  The Kerr factors are as follows: (1) the time and labor required; (2) the novelty and difficulty of the

questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975) (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974)).

The Court now turns to the attorneys' fee provisions contained in the agreements underlying this action.

### a.      The Attorneys' Fee Provisions in the Relevant Agreements

Plaintiffs proffer that the Note, Consulting Agreement, both guaranties, and the security agreements, each contain provisions which allow the prevailing party to recover attorneys' fees. (Horowitt Decl. ¶ 49.)  The Note provides that: "In the event Holder takes any action to enforce any provision of this Note, either through legal proceedings or otherwise, Maker promises to immediately reimburse Holder for reasonable attorneys' fees and all other costs and expenses so incurred."  (ECF No. 59-1 at 65-66.)  The Consulting Agreement provides that: "If any action or other proceeding is brought for the enforcement of this Agreement, or because of any alleged or actual dispute, in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled."  (ECF No. 59-1 at 71.)

The All Pure Guaranty and the APPS Guaranty have identical provisions which state that: "Guarantor further agrees, without demand, to immediately reimburse Creditor for all costs and expenses, including attorney fees, incurred in enforcing this Guaranty or collecting the Indebtedness, or in connection with or resulting from the engagement of counsel by Creditor during a restructuring or 'workout' of the Indebtedness."  (ECF No. 59-1 at 74, 78.)  The All Pure Security Agreement and the APPS Security Agreement contain the following identical

attorneys' fee provision: "Debtor will pay all costs and expenses of the Secured Party enforcing its rights under this agreement, including reasonable attorney fees." (ECF No. 59-1 at 90, 102.) Additionally, the Carter and Zavala Security Agreement contains the following provision: "Debtor will pay all costs and expenses of collection, including reasonable attorney fees." (ECF No. 59-1 at 109.)

The Court notes that the Stock Sale and Purchase Agreement itself does not contain an attorney's fee provision, however the Note is referenced in the Agreement and attached as Exhibit A to the Agreement (ECF No. 59-1 at 2, 16, 64), the Consulting Agreement is referenced in the Agreement and attached as Exhibit B to the Agreement (ECF No. 59-1 at 3, 18, 69), the All Pure Guaranty is referenced in the Agreement and attached as Exhibit C to the Agreement (ECF No. 59-1 at 3, 21, 73), the APPS Guaranty is referenced in the Agreement and attached as Exhibit D to the Agreement (ECF No. 59-1 at 3, 24, 77), the Carter and Zavala Security Agreement is referenced in the Agreement and attached as Exhibit E to the Agreement (ECF No. 59-1 at 3, 28, 106), the All Pure Security Agreement is referenced in the Agreement and attached as Exhibit F to the Agreement (ECF No. 59-1 at 3, 33, 82), and the APPS Security Agreement is referenced in the Agreement and attached as Exhibit G to the Agreement (ECF No. 59-1 at 3, 44, 94).

Based on the foregoing, the Court finds that this is an action on the contract and recommends that Plaintiffs recovery attorneys' fees and costs as the prevailing party. Cal. Civ. Code § 1717; In re Baroff, 105 F.3d at 442–43. The Court will now turn to determining the amount of reasonable attorneys' fees that Plaintiffs is entitled to recover. Drexler, 22 Cal.4th at 1095.

### b.      Reasonable Hourly Rate

The lodestar amount is to be determined based upon the prevailing market rate in the relevant community. Blum, 465 U.S. at 896 (1984). The relevant legal community for the purposes of the lodestar calculation is generally the forum in which the district court sits, Gonzalez v. City of Maywood, 729 F.3d 1196, 1205 (9th Cir. 2013), which in this matter is the Fresno Division of the Eastern District of California. The standard is the "rate prevailing in the

community for similar work performed by attorneys of comparable skill, experience, and reputation." Barjon v. Dalton, 132 F.3d 496, 502 (9th Cir. 1997) (quoting Chalmers v. City of Los Angeles, 796 F.2d 1205, 1210–11 (9th Cir.1986)).

Plaintiffs seek various hourly fees for the attorneys who provided services in this matter. While Plaintiffs have provided descriptions of the amount of experience of the attorneys, Plaintiffs presented no evidence regarding the reasonableness of the fees in this district.  Thus, the Court relies on fee awards in other cases in this district and relies on its own knowledge of customary legal local rates and experience with the legal market in setting a reasonable hourly rate.  See Ingram v. Oroudjian, 647 F.3d 925, 926 (9th Cir. 2011) (holding where party failed to submit affidavits from local attorneys or from a fee expert to show the requested rates matched the prevailing market rates, the district court appropriately relied, in part, on its own knowledge and familiarity with the local legal market).

In the Fresno Division of the Eastern District of California, generally, attorneys with experience of twenty or more years of experience are awarded $325.00 to $400.00 per hour, attorneys with ten to twenty years of experience are awarded $250.00 to $325.00, attorneys with five to ten years of experience are awarded $225.00 to $250.00, and less than $200.00 for attorneys with less than five years of experience.  See In re Taco Bell Wage & Hour Actions, 222 F.Supp.3d 813, 839 (E.D. Cal. 2016) (noting attorneys in Fresno Division with twenty or more years of experience are awarded $350.00 to $400.00 per hour, and attorneys with less than fifteen years of experience are awarded $250.00 to $350.00 per hour); see also Garcia v. FCA US LLC, No. 1:16-CV-0730-JLT, 2018 WL 1184949, at *6 (E.D. Cal. Mar. 7, 2018) (awarding $400.00 per hour to attorney with nearly thirty years of experience; $300.00 to attorney with nearly fifteen years of experience; $250.00 to attorney with ten years of experience; $225.00 to attorneys attorney with five years of experience; and $175.00 to attorney with less than five years of experience); Mike Murphy's Enterprises, Inc. v. Fineline Indus., Inc., No. 1:18-CV-0488-AWI-EPG, 2018 WL 1871412, at *3 (E.D. Cal. Apr. 19, 2018) (awarding attorney with over twenty years of experience the $325.00 per hour requested, the $300.00 per hour requested by attorney with nearly twenty years of experience, and attorney with seven years of experience the

1   requested $250.00 per hour); <u>TBK Bank, SSB v. Singh</u>, No. 1:17-CV-00868-LJO-BAM, 2018

2   WL 1064357, at *8 (E.D. Cal. Feb. 23, 2018), <u>report and recommendation adopted</u>, No.

3   117CV00868LJOBAM, 2018 WL 3055890 (E.D. Cal. Mar. 21, 2018) (awarding attorneys with

4   over thirty-five years of experience $400.00 per hour, attorney with twenty years of experience

5   $350.00 per hour; and attorney with ten years of experience $300.00 per hour); <u>Roach v. Tate</u>

6   <u>Publ'g & Enterprises</u>, No. 1:15-CV-00917-SAB, 2017 WL 5070264, at *10 (E.D. Cal. Nov. 3,

7   2017) (awarding attorney with sixteen years of experience $325.00 per hour in copyright action);

8   <u>Sanchez w. Frito-Lay, Inc.</u>, No. 1:14-cv-00797-AWI-MJS, 2015 WL 4662636, at *18 (E.D. Cal.

9   Aug. 5, 2015) (in a wage and hour class action finding reasonable rate of $350.00 per hour for

10  attorneys with more than twenty years of experience and $275.00 per hour for attorney with

11  fourteen years of experience).

12      Darryl Horowitt has been practicing law for nearly forty years with extensive trial and

13  general litigation experience.  (Horowitt Decl. ¶ 80.)  Counsel declares that his rate changed as

14  this litigation was ongoing, and is seeking $390.00 per hour for earlier work, and $410.00 per

15  hour for work conducted later in the litigation.   (<u>Id.</u>)   The Court finds both these rates are

16  reasonable based on the amount of experience.

17      William Coleman has been a practicing attorney since 1976, a period of over forty years.

18  (<u>Id.</u> at ¶ 81.)  Counsel Coleman's rate changed as this litigation was ongoing, and is seeking

19  $390.00 per hour for earlier work, and $410.00 per hour for work conducted later in the

20  litigation.  (<u>Id.</u>)  The Court finds both rates are reasonable based on this amount of experience.

21  (Horowitt Decl. ¶ 81.)

22      Sheryl D. Noel is a partner in the law firm and has been a practicing attorney since 1994,

23  a period of approximately twenty-five years, and proffers counsel Noel's customary rate is

24  $325.00 per hour.  (<u>Id.</u> at ¶ 82.)  However, a review of the timekeeping records reflect counsel

25  Noel billed at a rate of $350.00 per hour.  (ECF No. 82 at 79, 98.)  The Court finds the rate of

26  $350.00 per hour is reasonable based on this amount of experience.  (<u>Id.</u>)

27      Keith White is a partner in the law firm and has been a practicing attorney since 1996, a

28  period of nearly twenty-five years.  (<u>Id.</u> at ¶ 83.)  The Court finds his customary rate of $325.00

per hour is reasonable based on this amount of experience.  (Id.)

Jennifer T. Poochigian is a partner in the law firm and has been a practicing attorney since 2004, a period of approximately fifteen years.  (Id. at ¶ 84.)  The Court finds her customary rate of $325.00 per hour is reasonable based on this amount of experience.  (Id.)

Craig A. Tristao is a partner in the law firm and has been a practicing attorney since 2004, a period of approximately twelve years.  (Id. at ¶ 63.)  Counsel proffers counsel Tristao's customary rate is $325.00 per hour.  (Id.)  However, a review of the timekeeping records reflect counsel Tristao billed at a rate of $285.00 per hour.  (ECF No. 82 at 69.)  The Court finds the billed rate of $285.00 per hour is reasonable based on this amount of experience.  (Id.)

Rin Bo and Janet Sheen are paralegals that have been with the law firm since 2004.  (Id. at ¶ 64-65.)  The Court finds the requested rate of $165.00 is reasonable for the paralegal services rendered.[39]

Based on the foregoing, the Court recommends that Plaintiffs recover attorneys' fees in the amounts of: (1) $390.00 per hour for the earlier services of Darryl Horowitt and $410.00 per hour for the later services of Darryl Horowitt; (2) $390.00 per hour for the services of William Coleman; (3) $325.00 per hour for the services of Sheryl D. Noel, Keith White, Jennifer T. Poochigian, and Craig Tristao; and (4) $165.00 per hour for the services of paralegals Rin Bo and Janet Sheen.

### c.     Reasonable number of hours

"In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended."  Chalmers v. City of Los Angeles, 796 F.2d 1205, 1210 (9th Cir. 1986) (citations omitted).  "Those hours may be reduced by the court where documentation of the hours is inadequate; if the case was overstaffed and hours are duplicated; if the hours expended are deemed excessive or otherwise unnecessary."  Id.

Attorneys and paralegals enter their time into a commercial time and billing program and

---

[39]  Although a reduction in the paralegal fees could be justifiable, Schultz v. Ichimoto, No. 1:08CV526OWW SMS, 2010 WL 3504781, at *8 (E.D. Cal. Sept. 7, 2010) (stating 10 years ago that the favored paralegal rate is $75.00 per hour), the Court declines to recommend any deviation from the requested rate, given the nominal amount of hours expended at this rate.

Plaintiffs' counsel has submitted time records for each of the attorneys' work, and described the type of work each attorney completed.  (Horowitt Decl. ¶¶ 52-79, Ex. 7, ECF No. 82 at 58.)  The Court has reviewed the timekeeping records and although a relatively large amount of hours have been expended to reach this point in the litigation, the Court finds the amount of hours expended to be reasonable based on the complexity of the action, the repeated settlement negotiations with associated workups of damages, and the reasonable need for amending the complaint and filing the renewed motion for default judgment.

### d.     Reasonable Attorneys' Fee Award

Based on the foregoing, the Court finds that: (1) Darryl Horowitt reasonably expended 74.35 hours in this action at reasonable rates of $390.00, and $410.00 per hour, and the Court recommends awarding the requested total of $24,179.17; (2) William Coleman reasonably expended 42 hours in this action at reasonable rates of $390.00, and $410.00 per hour, and the Court recommends awarding the requested total of $16,454.00; (3) Sheryl D. Noel reasonably expended 2.6 hours in this action at a reasonable rate of $350.00 per hour, and the Court recommends awarding the requested total of $910.00; (4) Keith White reasonably expended 108.7 hours in this action at a reasonable rate of $325.00 per hour, and the Court recommends awarding the requested total of $27,660.83[40]; (5) Jennifer T. Poochigian reasonably expended 39.8 hours in this action at a reasonably rate of $325.00 per hour, and the Court recommends awarding the requested total of $12,921.00[41]; (6) Craig Tristao reasonably expended 0.10 hours in this action at a reasonable rate of $285.00 per hour, and the Court recommends awarding the

---

[40]  The Court notes that 108.7 multiplied by $325.00 equals $35,327.50.  Plaintiffs request $27,860.83 for these services, the same amount reflected in the timekeeping records.  (Horowitt Decl. ¶ 62; ECF No. 82 at 98.)  The earliest record for counsel White reflects the same hourly rate of $325.00 per hour (ECF No. 82 at 69), and it is not clear whether the reduction in the total amount was due to certain hours or billable totals being cut.  However, given the requested amount is the same total reflected in the timekeeping program, and any reduction does not cut against Defendants, the Court shall recommend awarding the requested amount.

[41]  The Court notes that 39.8 multiplied by $325.00 equals $12,935.00.  Plaintiffs request $12,921.00 for these services, the same amount reflected in the timekeeping records.  (ECF No. 82 at 98.)  It appears the earliest record for counsel Poochigian reflects the same hourly rate of $325.00 per hour (ECF No. 82 at 77), and it is not clear what accounts for the slight reduction in the total amount.  However, given the requested amount is the same total reflected in the timekeeping program, and any reduction does not cut against Defendants, the Court recommends awarding the requested amount.

1  requested total of $28.50; (7) Rin Bo reasonably expended 0.5 hours in this action at a reasonable

2  rate of $165.00 per hour, and the Court recommends awarding the requested total of $82.50; and

3  (8) Janet Sheen reasonably expended 0.80 hours in this action at a reasonable rate of $165.00 per

4  hour, and the Court recommends awarding the requested $132.00.  (Ex. 7, ECF No. 82 at 98.)

5       Accordingly, the Court recommends that Plaintiffs be awarded the requested attorneys'

6  fees in the total amount of $82,368.00.[42]

7       5.    <u>Costs</u>

8       Plaintiffs also seek reimbursement of costs in the amount of $400.00 for the filing fee

9  paid in this action as well as $2,416.65 for service of process.  (Mem. 25; Horowitt Decl. ¶ 48.)

10  Plaintiffs' memorandum requests a total of $2,816.55, however the proposed order and

11  declaration omit the $400.00 from the final calculation, showing a total of $2,416.55.  (Mem. 25;

12  Horowitt Decl. ¶ 85; ECF No. 90 at 5.)  It appears the correct total is $2,816.55.  (Horowitt

13  Decl., Ex. 7, ECF No. 82 at 96-97.)[43]

14       Accordingly, the Court finds that the costs sought are reasonable and recommends that

15  Plaintiffs' request for $2,816.55 in costs be granted.

16                                        **IV.**

17                      **FINDINGS AND RECOMMENDATIONS**

18       Having reviewed the papers and pleadings submitted in support of the motion for default

19  judgment, the Court finds that Plaintiffs have established each claim raised in the second

20  amended complaint.  The <u>Eitel</u> factors weigh in favor of granting default judgment, and the entry

21  of default judgment is within the discretion of the Court.  <u>See</u> <u>Aldabe v. Aldabe</u>, 616 F.2d 1089,

22  1092 (9th Cir. 1980).

23  *///*

---

[42]  The calculation within the timekeeping program appears correct: ($82.50  +  $28.50  +  $132.00  + $27,660.83  +  $12,921.00  +  $910.00  +  $24, 179.17  +  $16,454.00 = $82,368.00).

[43]  ($400.00 + $143.20 + $239.00 + $59.75 + $239.00 + $183.00 + $183.00 + $143.65 + $83.90 + $83.90 + $83.90 + $143.65 + $83.90  + $171.70  + $575.00  = $2,816.55).  A review of the spreadsheet reveals there are five charges for overnight mail not included in the requested costs: $20.24, $51.22, $20.24, $35.96, and $51.22. (ECF No. 82 at 96-97.)  The Court presumes Plaintiffs intentionally omitted these minor charges as not reflective of proper recoverable amounts, or omitted as nominal charges.

Based upon the foregoing, the Court HEREBY RECOMMENDS that:

1.     The Court GRANT Plaintiffs' motion for default judgment; and

2.     Judgment be entered in favor of Plaintiffs, and against Defendants, as follows:

**On the First Cause of Action**

Judgment in favor of Plaintiffs Robert and Sandra Christofferson against Defendants Jack Carter & Susie Carter[44] (in their capacity as Trustees only), Phil Zavala, Julie Zavala, All Pure, and All Pure Pool & Spa, Inc. (APPS), jointly and severally in the amount of $15,092.27, plus daily interest of $4.1349 from September 25, 2019 to the date of entry of judgment, plus costs and attorneys' fees.

**On the Second Cause of Action**

Judgment in favor of Plaintiffs Robert and Sandra Christofferson against Defendants Jack Carter & Susie Carter (as individuals and in their capacity as Trustees), Phil Zavala & Julie Zavala jointly and severally in the amount of $765,906.06, plus daily interest of $178.3617 from September 25, 2019, to the date of entry of judgment, plus costs and attorneys' fees.

**On the Third Cause of Action**

Judgment in favor of Plaintiff Robert Christofferson against Defendant All Pure in the amount of $231,047.65, plus accrued interest unpaid in the amount of $9,635.27, plus daily interest of $63.3007 from May 29, 2020, to the date of entry of judgment, plus costs and attorneys' fees.

**On the Fourth Cause of Action**

Judgment in favor of Plaintiffs Robert and Sandra Christofferson against Defendant All Pure in the amount of $780,998.33, plus daily interest of $182.4966 from September 25, 2019 to the date of entry of judgment, plus costs and attorneys' fees.[45]

**On the Fifth Cause of Action**

Judgment in favor of Plaintiffs Robert and Sandra Christofferson against Defendant All

---

[44]   While the proposed order spells Ms. Carter's name with a "z" (Suzie), the docket, complaint, and agreements spell her name with an "s" and the Court utilizes that spelling.  (ECF Nos. 59, 59-1 at 13.)
[45]   This is the sum of the amount owed on the Agreement and Note, plus the daily interest on both: ($15,092.27   +   $765,906.06 = $780,998.33) ($4.1349   +   $178.3617 = $182.4966).

Pure Pool & Spa, Inc. (APPS), in the principal amount of $1,012,045.98, plus daily interest of $182.4966 from September 25, 2019 to the date of entry of judgment, plus daily interest of $63.3007 from May 29, 2020 to the date of entry of judgment, plus costs and attorneys' fees.[46]

**On the Sixth Cause of Action**

Judgment in favor of Plaintiffs Robert and Sandra Christofferson against Defendant All Pure for the All Pure Collateral including:

(1)     All Accounts;

(2)     All Chattel Paper;

(3)     All Contracts;

(4)     All Equipment;

(5)     All General Intangibles;

(6)     All Goods;

(7)     All Instruments and letters of credit;

(8)     All Intellectual Property;

(9)      All Inventory;

(10)    All Investment Property;

(11)    All Deposit Accounts;

(12)    All money, cash, or cash equivalents; and

(13)    To the extent not otherwise included, all proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of each of the foregoing.

Or the amount of $780,998.33, plus daily interest of $182.4966 from September 25, 2019 to the date of entry of judgment, plus costs and attorneys' fees.[47]

---

[46]  The principal sum is the amount owed on the Agreement, Note, and Consulting Agreement: ($15,092.27  +  $765,906.06  +   $231,047.65 = $ 1,012,045.98).  The daily interest on the Agreement and Note accrues since September 25, 2019 ($4.1349  +   $178.3617 = $182.4966), and the daily interest on the Consulting Agreement accrues since May 29, 2020 ($63.3007).

[47]  This is the total amount of principal and interest owed by the Debtors under the Agreement and Note ($15,092.27 +   $765,906.06 = $780,998.33) ($178.3617  +   $4.1349 = $182.4966), as secured under the All Pure Security Agreement.

**On the Seventh Cause of Action**

Judgment in favor of Plaintiffs Robert and Sandra Christofferson against Defendant All Pure Pool & Spa, Inc. (APPS)[48]:

                    (1)      All Accounts;

                    (2)      All Chattel Paper;

                    (3)      All Contracts;

                    (4)      All Equipment;

                    (5)      All General Intangibles;

                    (6)      All Goods;

                    (7)      All Instruments and letters of credit;

                    (8)      All Intellectual Property;

                    (9)      All Inventory;

                    (10)    All Investment Property;

                    (11)    All Deposit Accounts;

                    (12)    All money, cash, or cash equivalents; and

                    (13)    To the extent not otherwise included, all proceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of each of the foregoing.

Or the amount of $1,012,045.98, plus daily interest of $182.4966 from September 25, 2019 to the date of entry of judgment, plus daily interest of $63.3007 from May 29, 2020 to the date of entry of judgment, plus costs and attorneys' fees.[49]

**On the Eighth Cause of Action**

Judgment in favor of Plaintiffs Robert and Sandra Christofferson against Defendants Jack Carter & Susie Carter (as individuals and in their capacity as Trustees), Phil Zavala, & Julie

---

[48]  While the proposed order refers to All Pure Pool Service of Central California, Inc., dba America's Swimming Pool Co. here (All Pure) (ECF No. 90), the seventh cause of action is directed at APPS under the APPS Security Agreement, not All Pure.  (ECF Nos. 59 at 2, 15; 59-1 at 94.)

[49]  This is the total amount of principal and interest owed by owed by the Debtors under the Agreement, Note, and Consulting Agreement (15092.27 + 765906.06 + 231047.65 = 1,012,045.98) ($178.3617 + $4.1349 = $182.4966), as secured under the APPS Security Agreement.  <u>See</u> Borges, 2003 WL 22725357, at *5.

Zavala, for the possession of all right, title, and interest in the stock shares now owned, or hereafter acquired in All Pure and APPS, as described <u>supra</u>, Section III(C)(2)(c), plus costs and attorneys' fees.

**On the Ninth Cause of Action**

Declaratory judgment in favor of Plaintiffs Robert and Sandra Christofferson against Defendants Jack & Susie Carter (individually and in their capacity as trustees), Phil Zavala, & Julie Zavala, determining that: (1) Defendants have breached their respective contracts and obligations, including the Agreement, Note, Consulting Agreement, All Pure Guaranty, APPS Guaranty, All Pure Security Agreement, APPS Security Agreement, and the Carter and Zavala Security Agreement; and (2) Plaintiffs are entitled to exercise their rights and remedies over the Carter and Zavala Collateral as set forth in the Carter and Zavala Security Agreement, including, but not limited to, transferring and registering the Carter and Zavala Collateral in their names, or any part of it, and exercise all rights, options, and privileges with respect to the Carter and Zavala Collateral as set forth in the Carter and Zavala Security Agreement.[50]

**On all Causes of Action**

Plaintiffs shall recover attorneys' fees and costs from Defendants, and each of them, who are liable jointly and severally, as follows:

(1)      Attorneys' fees in the amount of $82,368.00; and,

(2)      Court costs in the amount of $2,816.55.[51]

Defendants, and each of them, shall be entitled to a credit for the amount of proceeds recovered by Plaintiffs from the disposition of any of the personal property recovered by Plaintiffs from Defendants.

This findings and recommendations is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fourteen (14) days of service of this recommendation, any party may file written objections to this

---

[50]   As noted above <u>supra</u>, Section III(C)(2)(d), the Court recommends this declaratory judgment based on the parameters requested in the operative complaint.  (SAC at 22.)

[51]   As the Court found above, although the proposed order requested $2,416.55 in costs, the proper amount appears to be $2,816.55.  See <u>infra</u>, Section III(D)(5).

findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Further, Plaintiffs are HEREBY ORDERED to serve a copy of this findings and recommendations on Defendants within three (3) days of entry.

IT IS SO ORDERED.

Dated:   **June 16, 2020**

UNITED STATES MAGISTRATE JUDGE